[Civ. No. 20190.   Second Dist., Div. Two.   Dec. 23, 1954.]

BOARD OF· EDUCATION OF THE CITY OF LOS AN-
GELES, Respondent, v. FRANCES ROBMAN EISEN-
BERG, Appellant.

William B. Esterman for Appellant.

Harold W. ·Kennedy, County Counsel, Gerald G. Kelly, Assistant County Counsel, William E. Lamoreaux, Clarence H. Langstaff and James W. Briggs, Deputy County Counsel, for Respondent.

MOORE, P. J.—The question for decision is whether a teacher in the public schools has a constitutional right to her position after invoking her concededly constitutional privilege of refusing to answer the question: "Are you a member of the Communist Party of Los Angeles County?"—no other misconduct having been charged against her.

Appellant, Frances Robman Eisenberg, entered the public school system in 1933 as a substitute teacher. By 1944 she had advanced to the status of California lifetime teacher. On October 28, 1952, appellant appeared before the California Senate Fact-Finding Committee on Un-American Activities. While under oath, she refused to answer the quoted question. On November 20, 1952, basing his action on such refusal, the superintendent of the Los Angeles City School Districts formally charged her with unprofessional conduct and violation of the board of education rule requiring her to tell a senatorial committee whether she belonged to the Communist Party.

The Legislature has enacted statutes designed to prohibit the infiltration of communists into the ranks of employees in public service and to prevent the spread of the practices and doctrines of communism. By statute in 1951, the lawmakers forbade the teaching of communism "with intent to indoctrinate any pupil." (Ed. Code, § 8275.) In 1952, the Los Angeles Board of Education made a study of the subject and published its findings that "there are active disciplined com-

---

*Assigned by Chairman of Judicial Council.

munist organizations presently functioning'' in the Los Angeles School, High School and Junior College Districts; that there is a clear and present danger that the members of such organizations will engage in concerted effort to hamper, restrict, impede or nullify the efforts of the Los Angeles Board of Education to enforce section 8275, *supra.**

Thereupon, the board adopted the rule, section 2 of which provides that no person who is knowingly a member of the Communist Party shall hereafter be employed by, or retained in the employment of, any school district, except as provided in section 3. Section 5 made it the duty of any employee of any school governed by the Los Angeles Board of Education who is subpoenaed by an un-American Activities Committee of either the American Congress or of the California Legislature to appear before such committee to answer specifically under oath questions propounded by the committee relative to ''membership in the Communist Party.''

The same section makes guilty of insubordination and subject to dismissal, any employee who refuses to answer under oath *any question* propounded by any such committee or subcommittee. Also, section 7 makes the violator of the rule guilty of unprofessional conduct.

By virtue of the board's service upon appellant of its findings and the rule, she knew their contents on October 22, 1952, knew that her refusal to answer, before a legislative committee, questions on any topic specified in section 5 required dismissal from the Los Angeles High School District, and knew that employees of the district were required to ap-

---

*Education Code, section 8275.

''No teacher giving instruction in any school, or on any property belonging to any agencies included in the Public School System, shall advocate or teach communism with the intent to indoctrinate any pupil with, or inculcate a preference in the mind of any pupil for communism.

''The Legislature in prohibiting the advocacy or teaching of communism with the intent to indoctrinate any pupil with or inculcate a preference in the mind of any pupil for, such doctrine does not intend to prevent the teaching of the facts of the above subject but intends to prevent the advocacy of, and inculcation and indoctrination into communism as is hereinafter defined, for the purpose of undermining the patriotism for, and the belief in, the Government of the United States and of this State in the minds of the pupils in the Public School System.

''For the purposes of this section, communism is a political theory that the presently existing form of government of the United States or of this State should be changed, by force, violence, or other unconstitutional means, to a totalitarian dictatorship which is based on the principles of communism as expounded by Marx, Lenin and Stalin.''

pear before such committee to answer whether they were members of the Communist Party.

When she refused to answer whether she was a member of the Communist Party of Los Angeles County, the superintendent of schools forthwith charged her with unprofessional conduct and violation of the board's rule. Pursuant to appellant's demand for a hearing thereon, the board filed a complaint in the superior court alleging that cause existed for the dismissal of appellant from the Los Angeles school system. The trial court found the charge to be true within the meaning of section 13521 of the Education Code which authorizes the dismissal of a permanent employee for violating section 8275.

On appeal she contends that the judgment is unjust and assigns certain rulings and conclusions as unjustified, certain laws as violative of her constitutional guaranties.

█ Appellant assigns as prejudicial the court's exclusion of her testimony: that she believed it was her duty to invoke and protect the provisions of the Education Code and of the state and federal Constitutions and that she did only that while before the legislative committee; that she believed the committee had no power to inquire into her beliefs, her communications or associations, and that the procedures of the committee were unconstitutional; that she believed her answering the question would be to participate in wrongdoing and that it was her duty not to cooperate in such acts of the school board; that if she had acted otherwise, she would have rendered herself a corrupt, indecent person, unfit to teach school.

Such testimony was irrelevant to the issues of the truth or falsity of the charge against her. The court's duty was plain: to ascertain whether the charge of appellant's refusal to answer was true. Her beliefs had nothing to do with it. Having found that the committee convened, that appellant appeared, that the question was asked, and that she refused to answer, the court had not far to seek to conclude that her intransigence constituted sufficient grounds for her dismissal. The rule of the board made it imperative that her guilt be adjudged. The truth of the charge did not depend in the slightest degree upon her beliefs. (*Christal* v. *Police Com.*, 33 Cal.App.2d 564, 568 [92 P.2d 416]; *Workers Intl. Union* v. *Superior Court*, 103 Cal.App.2d 512, 534 [230 P.2d 71]; *Cope* v. *Davison*, 30 Cal.2d 193, 200 [180 P.2d 873, 171 A.L.R.

667].) The duty of the court to order her dismissal was according to the truth of the charge. Her only way to avoid a dismissal was to answer the question. The artificial argument that her conduct was not involved is of no avail. She was on trial for her conduct, to wit, not answering a question relating to the public good. No exceptions were provided for in the rule violated.

### The Rule Is Valid

Appellant proposes that the rule of the board is unconstitutional as an unauthorized assumption of legislative power and violates her right of due process. She contends that the Levering Act (Gov. Code, §§ 3100-3109) had prescribed an oath which she had signed two years previously; that such act occupies the field of legislation on the subject of loyalty oaths and prescribes the only one which may be required of a county employee. Such argument has already been answered by this court in *Board of Education* v. *Wilkinson*, 125 Cal.App.2d 100 [270 P.2d 82]. It involved the same board of education and the same rule. Mr. Justice Drapeau points out that the Levering Act does not prohibit school boards from requiring their employees to be loyal to the state and to the nation; that it does not relieve such boards from inquiring into the fitness of teachers or from prescribing reasonable rules for our protection against traitors; that the citizens of America are entitled to know whether any public employee is a communist. (See *Fraser* v. *University of California*, 39 Cal.2d 717, 718 [249 P.2d 283]; *Christal* v. *Police Com., supra.*) In the Christal case, the officers accused insisted that they were not obliged to answer questions that would tend to incriminate them. But because they refused to answer did not make them white as snow. Their refusal disqualified them as police officers and was cause for their dismissal. Paraphrasing Justice Holmes,* they had a constitutional right to talk politics, but no constitutional right to be policemen.

Not only did the Levering Act have nothing to do with the conduct of teachers who appear before investigating committees, but it merely requires a loyalty oath as a condition precedent to public employment and occupies the field of legislation on the subject of loyalty oaths for public employees. (*Bowen* v. *County of Los Angeles*, 39 Cal.2d 714, 715 [249 P.2d 285].) Moreover, only two years after the

---

*McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216 [29 N.E. 517].

adoption of the Levering Act, the Dilworth Act* was created solely because the Levering Act had nothing to do with teachers and communism.

Now, the giving of a loyalty oath to teachers is not, in the slightest degree, relevant to the issues in the case at bar. A public school teacher's refusal to answer before a legislative committee whether she is a member of the Communist Party is the only question involved in this action. Neither the board nor the Legislature itself deemed a compliance with the Levering Act sufficient protection for the public. A teacher must answer directly that she is or is not a member. Past pledges or oaths of loyalty are not sufficient for the school board which has jurisdiction over a vast empire of wealth, pupils and teachers. Its responsibility impels it to require every teacher to stand and be counted. Unless it knows the extent of reliance to be placed in a teacher, its attempt to preserve American ideals will go for naught and treason might run rampant.

One year after the school board had adopted its rule, the Legislature enacted the Dilworth Act, which in turn approved of the right of the board to make rules on the subject of keeping communists out of the public schools and validated any rule, regulation or order previously enacted by school boards. It is consonant with law and with pertinent statutes and is therefore invaluable to the government of the Los Angeles City School Districts. (*Tucker* v. *San Francisco Unified Sch. Dist.*, 111 Cal.App.2d 875, 882 [245 P.2d 597].) In view of the findings that there is a present, imminent danger that communist organizations in the district will engage in concerted undertaking to hamper the efforts of the board to comply with section 8275 of the Education Code and in view of appellant's obligation to inform the board whether she

---

*Dilworth Act, section 4.

''The purpose of this act is to declare a state policy and provide a uniform procedure applicable to all school districts whereby members of school district governing boards shall suspend and dismiss or refuse to employ persons who are knowingly members of the Communist Party and shall suspend and dismiss employees who fail or refuse to answer the pertinent questions specified in this act. Nothing in this act is intended or shall be construed to limit or restrict the rule-making power of governing boards of school districts. Any rule, regulation or order heretofore adopted on this subject by any such governing board is hereby validated and declared to be fully and completely effective to the extent it is consistent with this act and any such rule, regulation or order shall only be superseded by this act to the extent inconsistent with this act.'' Stats. 1953, ch. 1632.

is a member of a communist organization whose tenets she was forbidden to impart to her students, it cannot with reason be said that the adoption of its rule on September 22, 1952, was unreasonable or that it conflicts with appellant's constitutional guaranties.

Appellant contends that the Constitution requires a showing that she knew of the activities or purposes of the Communist Party before she may be discharged for a refusal to answer the question, citing *Wieman* v. *Updegraff,* 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216]. The cited case is not authority for such contention. It does not require a public employee to have knowledge of the activities or purposes of an organization to which he belongs if it has been proscribed by name. It holds merely that a statute may not require a public employee to know at his peril whether all the organizations of which he is a member and are not named in the statute, advocate the forceful overthrow of the government by unlawful means. The case requires not knowledge on the part of the teacher that her organization advocates the violent overthrow of the government, but knowledge that it is proscribed to public employees as a condition of continued employment.

From the court's review of the authorities cited in *Wieman* v. *Updegraff,* it is there made clear that the decision was confined to the holding that a statute is fatally defective when it requires an employee to state whether he belongs to unnamed proscribed organizations, when the employee is not allowed, for lack of knowledge, to say that his organization was in the proscribed class. In the case at bar, the question was whether appellant was a member of an organization which is proscribed in the board's rule. She knew the rule's contents. The incidents of due process had been meticulously observed, notwithstanding former holdings that due process of law does not require that a teacher must have had knowledge of the activities or purposes of the Communist Party. (*Wieman* v. *Updegraff, supra*; *Galvan* v. *Press,* 347 U.S. 522 [74 S.Ct. 737, 98 L.Ed. 911].)

The board's rule presents none of the difficulties encountered by the courts in the Wieman case. It was skillfully prepared with a view to an observance of the constitutional guaranties of the employees of the Los Angeles School Districts. It prevents a member of the Communist Party from obtaining or retaining employment in the Los Angeles City School Districts; requires an employee to indicate under oath

whether he is or has been a member of the Communist Party; requires the employee subpoenaed by a legislative committee or the board of education to answer five questions relating to his loyalty and duties. Section 3 allowed an employee 30 days from the date of the adoption (September 22, 1952) to resign in good faith from the Communist Party, and retain his position with the board. Sections 5 and 6* of the rule give the five questions which must be answered when asked by a legislative committee, or board of education member or the superintendent of schools. Failure or refusal to answer any such question requires dismissal.

No PRIOR DETERMINATION OF RELEVANCY REQUIRED

Appellant is obsessed with the notion that before the school board could act upon the complaint and discharge her,

---

*"Los Angeles City School Districts. Superintendent's Bulletin No. 1. Rules and orders of the Board of Education Relating to (a) Membership in the Communist Party and (b) the Obligation to answer Questions Concerning Duties and Loyalty. . . .

"Section 5. It shall be the duty of any employee of any school district governed by the Los Angeles City Board of Education who may be subpoenaed by a United States Congressional Un-American Activities Committee or any other committee or subcommittee of the United States Congress or the California Legislature or of either House of either thereof to appear before said committee or subcommittee and specifically to answer under oath questions propounded by the committee or subcommittee relating to:

"a. Present personal advocacy by the employe of the forceful overthrow of the government of the United States or of any state or political subdivision.

"b. Present membership in any organization now advocating the forceful overthrow of the government of the United States or of any state or political subdivision.

"c. Past membership in any organization which during the time of the employe's membership advocated the overthrow of the government of the United States or of any state or political subdivision.

"d. Questions calling for answers pertaining to the employe's school district duties based upon the personal knowledge of the employe of persons, places, and conversations, exclusive of conversations privileged under Section 1881, Code of Civil Procedure.

"e. Questions as to membership in the Communist Party.

"Any employe who fails or refuses to answer under oath any such questions propounded by any such committee or subcommittee shall be guilty of insubordination and guilty of violating this rule and shall be dismissed from his employment in the manner provided by law."

Section 6 is substantially the same as section 5, but it requires any employee of the Board to answer under oath questions propounded by a member of the Board of Education or by the Superintendent relating to the topics included in a, b, c, d and e, and makes any employee who fails or refuses to answer under oath any such questions propounded by a member of the Board of Education or the Superintendent of Schools guilty of insubordination and guilty of violating this rule "and shall be dismissed from his employment in the manner provided by law."

she was entitled to have the superior court determine that the question propounded to her was relevant. Relevant to what? That question, itself, was the sum total of all that was before the legislative committee. The rule was a simple statement that "it shall be the duty of any employee . . . who may be subpoenaed by . . . a California Legislative Un-American Activities Committee . . . to appear . . . and specifically to answer . . . e. Questions as to membership in the Communist Party." Of course, it placed appellant in an unfortunate situation in that she must answer or be "guilty of violating this rule," of the board, an act of insubordination. The procedure of the board in discharging appellant was not the final scene. She was entitled to a trial before the court and there they tried anew the very issue determined by the board. If the question had been irrelevant, the court below had the opportunity so to determine before approving of her dismissal. In the Wilkinson case, *supra,* the court said: "This is not a contempt proceeding . . . the duty of the court began and ended with a determination that defendant's conduct did or did not constitute grounds for dismissal." If a teacher may be dismissed for refusal to accept teaching assignments (*Board of Education* v. *Swan,* 41 Cal. 2d 546, 551 [261 P.2d 261]), there is equally as good reason for her dismissal when she has refused to answer whether she is a member of the Communist Party. The existence of that party which the board had found to be "a clear and present danger," engaged in concerted effort "to nullify the efforts of the Los Angeles City Board of Education to comply with and enforce Section 8275 of the Education Code" is a real danger to the district.

Not only do the facts herein recited argue that appellant was not entitled to judicial guidance on the question of relevancy, but highly respectable authority holds that a witness acts at his peril when he refuses to answer. (*Sinclair* v. *United States,* 279 U.S. 263, 274 [49 S.Ct. 268, 73 L.Ed. 692] ; see also *Morford* v. *United States,* 339 U.S. 258 [70 S.Ct. 586, 94 L.Ed. 815].)

### SENATE ENABLING ACT NOT UNCONSTITUTIONAL

Appellant vainly seeks to undermine Senate Resolution 127 by contending that it is too vague. She says the resolution makes no suggestion as to the identity of the persons who are to be denied protection under the Bill of Rights; that the resolution has no limitations and that it covers every area of work in California; that "a legislative body may not im-

pose restrictions that are unnecessary or unreasonable.''

The rights of appellant under the federal Constitution are not invaded by Senate Resolution 127. Appellant has not made a speech or published a sentence. Her mistake, so far as free speech is concerned, is her refusal to say ''yes'' or ''no.'' The resolution has no vague and ambiguous terms. But if it had, it is only a resolution, not a statute. All of appellant's argument on this score and all the authorities she cites pertain to the enactment of statutes. It is true that laws made by a Legislature must be clear and unambiguous. The Legislature having determined, as did the Los Angeles Board of Education, that the infiltration of communism is detrimental to the general welfare, it did the next logical thing by sending out, as its emissaries, committees to ascertain the extent of the detriment caused and likely to be caused by advocates or prowlers for communism. There is nothing un-American in such action. It is done to protect the United States and every political subdivision thereof. No attempt is made to bridle free speech. The resolution means no more than ''stand up and be counted.'' It makes no interdiction against any person's saying whatever he desires to say. It is designed to give the Legislature a knowledge of social conditions prevailing in California whereby to make laws intelligently. If a teacher will not cooperate by informing the committee whether he is a party member of the communists, he violates a definite rule of his school board and is entitled to nothing but dismissal from the service.

The adoption of Senate Resolution 127* is authorized by section 37 of article IV of the Constitution whereby a committee so appointed may make recommendations ''as to any subject within the scope of legislative regulation or control.'' The power of the Legislature to appoint such committees and their power to investigate un-American activities has been exercised repeatedly. (*Barsky* v. *United States*, 167 F.2d 241, 245 [83 App.D.C. 127] ; 334 U.S. 843 [68 S.Ct. 1511, 92 L.Ed.

---

*Senate Resolution No. 127 empowered the Senate Committee, *inter alia*: ''to investigate, ascertain, study and analyze all facts relating directly or indirectly . . . to the activities of groups and organizations which have as their objectives, or as part of their objectives, the overthrow of the State of California or of the United States by force, violence or other unlawful means; to all organizations known or suspected to be dominated or controlled by a power seeking to impose a foreign political theory upon the government and people of the United States; to all persons who belong to or are affiliated with such groups or organizations. . . .''

1767]; *United States* v. *Josephson,* 165 F.2d 82, 90, 333 U.S. 838 [68 S.Ct. 609, 92 L.Ed. 1122].) On the question of definiteness of terms employed in the resolution, the language of the resolution involved in the Barsky case was held to be definite enough: "subversive and un-American propaganda that attacks the principle of the form of government as guaranteed by our Constitution"; it conveys a clear meaning and that is all that is required.

The claim that the Resolution 127 authorizes prior censorship of ideas is defeated by the very existence of the First Amendment to the Constitution. ▇▇ "The power of Congress to gather facts of the most intense public concern, such as these, is not diminished by the unchallenged right of individuals to speak their minds within lawful limits. When speech or propaganda, or whatever it may at the moment be called, clearly presents an immediate danger to national security, the protection of the First Amendment ceases." (*United States* v. *Josephson, supra.*)

Because of plaintiff's violation of a lawful rule of her employer, the Los Angeles Board of Education, it was authorized to dismiss her from public service.

Judgment affirmed.

McComb, J., and Fox, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 16, 1955. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.