[No. D001626. Fourth Dist., Div. One. Nov. 26, 1985.]

SAN DIEGUITO UNION HIGH SCHOOL DISTRICT,
Plaintiff and Respondent, v.
COMMISSION ON PROFESSIONAL COMPETENCE,
Defendant and Respondent;
GRETCHEN HARRIS, Real Party in Interest and Appellant.

COUNSEL

David H. Askey for Real Party in Interest and Appellant.

Pettit & Martin, Mary Jo McGrath and Peter M. Bransten for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

OPINION

WIENER, J.—Gretchen Harris (Harris) is a permanent certificated employee of the San Dieguito Union High School District (District). On May

8, 1980, the District gave Harris written notice of its intention to dismiss her. In proceedings before the Commission on Professional Competence (Commission) pursuant to Education Code section 44932[1] the Commission determined that no grounds for dismissal existed and ordered that she should not be dismissed. The District then sought and obtained a writ of mandate in the superior court commanding the Commission to set aside its decision and to order Harris' dismissal from the District's employment. Harris successfully appealed. (See *San Dieguito Union High School Dist.* v. *Commission on Professional Competence* (1982) 135 Cal.App.3d 278 [185 Cal.Rptr. 203].) On remand the trial court again directed the Commission to set aside its decision and ordered Harris' dismissal. Harris again appeals. We affirm.

## FACTS

The District's statement of charges against Harris allege cause to dismiss her on two separate grounds: evident unfitness for service (§ 44932, subd. (e) [now § 44932, subd. (a)(5)]) and persistent violation or refusal to obey the school laws of the state or reasonable regulations of the District (§ 44932, subd. (g).)

The specific acts forming the basis of Harris' alleged unfitness were her numerous intermittent absences totalling 21 percent of all work days over a 4-year period: 22 days in the school year 1976-1977; 54 days in 1977-1978; 38½ days in 1978-1979; and 33½ days in 1979-1980. Harris' alleged refusal to obey the District's regulations was based on the numerous times she had failed to supply lesson plans for substitute teachers.

The trial court found the evidence in the administrative record established cause existed for Harris' dismissal for both unfitness and persistent refusal to follow the District's regulations.

## DISCUSSION

*Standards of Review*

As stated in *San Dieguito,* "The decision of the Commission may be challenged in the superior court by means of a petition for writ of mandate. (§ 44945; Code Civ. Proc., § 1094.5.) In reviewing a Commission's

---

[1]All statutory references are to the Education Code unless otherwise specified.

decision for either the governing board or the employee the superior court shall exercise its independent judgment on the evidence. (§ 44945.) ■ An appellate court must sustain the superior court's finding if supported by substantial evidence. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)" (*Id.* at p. 283.)

■ The foregoing brief summary explains the respective roles of the trial and appellate courts. The trial court is "not bound by the findings of the Commission in exercising its independent judgment review [citation], and, . . . [is] free to make its own determination of the credibility of witnesses in the process." (*Pittsburgh Unified School Dist.* v. *Commission on Professional Competence* (1983) 146 Cal.App.3d 964, 977 [194 Cal.Rptr. 672].) ■ As a matter of public policy where administrative adjudications are subject to the independent judgment test the responsibility to make factual determinations is left with the trial court rather than with the administrative agency. (*Guymon* v. *Board of Accountancy* (1976) 55 Cal.App.3d 1010, 1015 [128 Cal.Rptr. 137].)

■ After the superior court makes an independent judgment upon the record of an administrative proceeding our scope of review on appeal is limited. "An appellate court must sustain the superior court's findings if substantial evidence supports them. [Citations.] In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment. When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court. [Citation.]" (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

Here, our analytical responsibility is to examine the administrative record to determine whether it contains the evidence referred to in the court's statement of decision and later judgment. If there is substantial evidence on either ground upon which the court based its determination of cause to dismiss Harris, we must affirm the judgment.

*Persistent Violation of District's Regulations*

■ The court's conclusions that Harris' dismissal could be based upon a violation of school rules within the meaning of section 44932, subdivision (g) were predicated on the following.

The District notified Harris of failing to provide lesson plans on June 6, 1977, January 11, March 29, April 24, May 8, May 21, 1978 and on April

14 and April 28, 1980. Harris acknowledged she had received written notices complaining about her lack of lesson plans.

The court found Harris "repeatedly failed to provide adequate and timely lesson plans for substitute teachers which could have somewhat mitigated the detrimental effects of her absences on her students."

Harris was transferred to the Torrey Pines High School for the school year 1979-1980. William Butler, the principal of Torrey Pines testified he was aware Harris had a reputation for excessive absenteeism. He conferred with her in September 1979 during what he described as an "initial goal setting conference." In the written evaluation conference form signed by both Butler and Harris, Harris' responsibilities included "[setting] goals of improving personal attendance, *providing thorough lesson plans when absent, and calling early for a substitute when needed.*" After that meeting Harris failed to provide lesson plans on five occasions. On a few occasions the teacher substituting for Harris managed to contact Harris by telephone after class had started in order to locate the lesson plans. In many instances Harris could not be reached when such attempts were made.

Kay Dillon, a teacher with administrative responsibility in the Spanish department at Torrey Pines testified Harris worked in her department during the 1979-1980 school year. Teachers substituting asked her for assistance because they were unable to find lesson plans. Dillon would unsuccessfully attempt to locate the plans. Harris also failed to fill out the "substitute teachers' information sheet" on which the teachers were to provide the location of lesson plans. On several occasions when there were no lesson plans the substitutes for Harris complained they were hampered in teaching Harris' class.

Darlene Palmer, an English teacher and department chairperson at Torrey Pines testified Harris failed to supply lesson plans for substitute teachers. Three substitutes asked Palmer's assistance because they were unable to find lesson plans. Palmer explained she never had any difficulty in locating lesson plans for other substitutes who filled in for the 19 other English teachers in her department.

Susan Martino, a Spanish teacher at Torrey Pines during the 1979-1980 school year testified she shared a desk with Harris. When asked for a lesson plan by a substitute she was unable to locate it.

Kathleen Oversmith substituted 17 times for Harris. She could not locate lesson plans on about 12 of those occasions. The lessons she did find were

either vague or unhelpful. Incomplete lesson plans omitted titles of books which were to be used and when a particular chapter was mentioned the book remained unknown. Oversmith expressed surprise at the lack of students' progress in Harris' class compared to the level of achievement in the other classes at Torrey Pines in which she had been a substitute teacher.

John Silverman substituted for Harris six times over a two-year period commencing in 1977-1978. No lesson plans were made available to him. He would ask the class what they had been doing. He described that inquiry as a "somewhat fruitless" exercise. He testified that ordinarily, at least 97 percent of the time when he would substitute he would receive a detailed lesson plan.

*Application of the Morrison Criteria*

■ In weighing the evidence to determine whether Harris' conduct was sufficient to warrant dismissal, the trial court followed *San Dieguito's* instructions and applied the criteria of *Morrison v. State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375]. *Morrison* recommended seven criteria should be considered in determining unfitness to teach: (1) likelihood of recurrence of the questioned conduct; (2) extenuating or aggravating circumstances; (3) effect of notoriety and publicity; (4) impairment of teacher—student relationships; (5) disruption of the education process; (6) motive; (7) proximity or remoteness in time of conduct. (*Id.* at p. 229; see also *San Dieguito,* 135 Cal.App.3d at pp. 278, 284.)

■ Here, the trial court's written statement of decision examined and explained why each of the *Morrison* criteria was applicable.

The court explained it believed the likelihood of Harris' conduct adversely affected students or fellow teachers was reflected in the testimony of teachers who had to assist substitute teachers in Harris' classes. When administrators or other teachers were required to devote their time to locate lesson plans valuable time which could otherwise have been devoted to educational purposes was being wasted.

The court stated these "repeated failures to supply adequate and timely lesson plans have been persistent for the last four (4) year period [under] . . . review . . . despite numerous communications to Harris of the problems associated therewith." The court concluded the failure to provide lesson plans where the teacher is absent a considerable period of time has a

continuing adverse effect on students, teachers and parents particularly where the behavior continued over a period of time.

The court was also concerned that the subjects Harris taught were "academic basics which require diligent, continuing and progressive instructions in contrast to that held by one of Harris' two witnesses who testified [s]he was out frequently but who [was] a P. E. teacher. The stress placed on academic basics for High School students is uncontroverted and within the common knowledge of any teacher or parent whose child seeks a higher education."

Although the court improperly considered the number of Harris' absences as per se unfitness, a consideration precluded by *San Dieguito,* since those absences had been stipulated to as being legitimate within the District's policy (*id.* 135 Cal.App.3d at p. 289), the court properly focused on the "detrimental effect on [Harris'] students which was being compounded by her failure to provide adequate and timely lesson plans." The court decided "Harris' response to these problems was one of indifference and a feeling that she had no responsibility to assure location of the lesson plan by substitute teachers when she was absent."

Harris had been on notice since 1976 of the need to provide lesson plans in an appropriate and accessible location. In light of Harris' continuing conduct the court concluded it was likely Harris would repeat her unsatisfactory performance since she appeared to be indifferent to the seriousness of the problem.

The court also weighed the extent to which the disciplinary proceedings on Harris could create a chilling effect upon the constitutional rights of other teachers. In resolving this issue the court was satisfied the District was addressing a teaching issue not an unrelated social or political problem. The court decided that within this narrow context involving the need to properly educate students there could be no harmful effect on the constitutional rights of other teachers.

In summary, the trial court considered and correctly applied the *Morrison* criteria. The court's determination that Harris' violations were persistent, i.e., stubborn and continuing (*Governing Board of the Oakdale Union School Dist.* v. *Seaman* (1972) 28 Cal.App.3d 77, 82 [104 Cal.Rptr. 64]) is supported by the evidence.

*Conclusion*

The trial court in this case was required to function within the framework of *San Dieguito* since *San Dieguito* "remanded [the case] for further pro-

ceedings conformable to this opinion." (*Id.* 135 Cal.App.3d at p. 289.) *San Dieguito* held, "Without question a persistent refusal to prepare lesson plans for substitute teachers, viewed in light of the number of absences Harris was experiencing, might be sufficient to constitute 'persistent violation of school rules' within the meaning of Education Code section 44932, subdivision (g)." (*San Dieguito,* at pp. 287-288.) Had the *San Dieguito* decision decided otherwise and held the trial court could not decide in favor of the District, it would have reversed with instructions to deny the District's writ and to enter judgment for Harris.

Having complied with *San Dieguito's* instructions on a record which contains substantial evidence to support the court's findings and conclusions, we affirm the judgment.

### DISPOSITION

Judgment affirmed. The parties to bear their respective costs on this appeal.

Butler, J., concurred.

**STANIFORTH, Acting P. J.**—I respectfully dissent.

Gretchen Harris again appeals a superior court judgment granting the San Dieguito Union High School District's (District) petition for a writ of mandate to set aside a decision of the Commission on Professional Competence (Commission)[1] declaring the District lacked cause to dismiss Harris from her position as a certificated public school teacher for the District.

### FACTS

Harris taught Spanish and English as a permanent certificated employee of the District. Beginning in 1976 she was absent intermittently from her teaching duties due to various serious illnesses of her young son, her mother and herself. Harris' absences totaled some 21 percent of all work days for

---

[1]Education Code section 44944, subdivision (b), provides for the appointment of a three-member Commission on Professional Competence to conduct a hearing to determine whether cause exists for a school district to dismiss a public school employee. The State Office of Administrative Procedure appoints one member, a hearing officer who chairs the hearing; the governing board of the District selects a second member; and the employee chooses a third. The latter two members must hold currently valid teaching credentials and must have at least five years' experience in employee disciplinary matters within the last ten years.

the preceding 4 school years: 22 days in 1976-1977; 54 days in 1977-1978; 38½ days in 1978-1979; 33½ days in 1979-1980. The parties stipulated at the hearing before the Commission and on the record on appeal these absences were "for reasons considered legitimate under District policy."

On May 8, 1980, the governing board of the District gave Harris written notice of dismissal after it had found by a majority vote that cause existed for her dismissal under Education Code section 44932, subdivision (e) ([now § 44932, subd. (a)(5)] evident unfitness for service) and section 44932, subdivision (g) (persistent violation of or refusal to obey "school laws or reasonable regulations").

At Harris' request a four-day evidentiary hearing was held before the Commission. (Ed. Code, § 44944, subd. (b).) There was little dispute over the facts of Harris' absences. The conflict arose over the effect of the absences and Harris' alleged violation of the rules governing preparation and provision of lesson plans for substitute teachers. Harris' supervisors, testifying for the District, said the absences had a disruptive effect on the students. *Two* substitute teachers out of sixteen who had filled in for Harris said they could not find lesson plans on Harris' desk when they substituted for her. One of the substitutes (Oversmith) said Harris' lesson plans were provided only three or four times of the seventeen times she substituted.

Beginning in 1977 Harris received numerous written and oral warnings from her superiors of the negative effects of her absences. Harris testified she had not noticed any problems with the students due to her absences and said she had always provided lessons for substitutes as required by school policy. She admitted her plans were sometimes not received by the substitutes but this was due to a breakdown in the District's system of substitute teacher preparation. Harris stated she had never received complaints upon her return to school about the missing lesson plans. Harris said the frequent illnesses in her family appeared to be over and she did not anticipate further difficulty in her attendance at school.

Several fellow teachers were called as her witnesses. One co-worker testified he had excessive absences over the past several years due to family illnesses and had not received memos from the administration nor had termination proceedings been initiated against him. Other witnesses testified substitute teachers could, if properly qualified, carry on proper classroom continuity and Harris' teaching performance was satisfactory. *The Commission unanimously decided cause for dismissal was not established.* The Commission recommended the District hire a stand-in substitute in case of further absences by Harris and ordered payment of her attorney fees. (Ed.

Code, § 44944, subd. (e).) The District petitioned the superior court for a writ of mandate to set aside the Commission's decision. The superior court judge disagreed with the Commission and found that the District did have cause for dismissal. This determination was made upon the identical factual base used by the Commission.

In our first opinion, we concluded the trial court erred in finding Harris' absences were of such frequency and nature as to show evident unfitness to teach pursuant to Education Code section 44932, subdivision (e) (now subd. (a)(5)). We noted the trial court's "conclusion rests upon this nonsupportive base: Harris' absences were stipulated to be 'for reasons considered legitimate under District policy.' Her absences consisted of sick leave, personal leave and leave without pay and other recognized categories of legitimate absence. The trial court was presented with undisputed facts the absences upon which the District formed the basis for removal were considered legitimate.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"The District by its stipulation has precluded the charge that Harris' absences are unreasonable. Here the District stipulated the policy regarding absences had not been violated. The District did in fact deduct from Harris' pay after she had used up her sick leave. The school system assumes a teacher will on occasion be absent and provides for competent substitutes." (*San Dieguito Union High School Dist.* v. *Commission on Professional Competence* (1982) 135 Cal.App.3d 278 at pp. 286-287 [185 Cal.Rptr. 203].) We also noted the superior court failed to apply the objective criteria required by *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375]. As shall be documented in VIII *infra,* the trial court has again failed to fulfill the duty imposed by the *Morrison* decision. I look in vain for substantial evidence to support the trial court's conclusion on the requirement to removal of a teacher.

We earlier concluded the trial court erred in finding Harris' failure to submit lesson plans for substitute teachers constituted persistent violation of, or refusal to obey, the rules of the District since the trial court based its finding solely upon the number of Harris' absences and not on whether Harris' failure to obey the rules was clearly willful. (*San Dieguito, supra,* at p. 287.)

On remand, the trial court issued a 10-page statement of decision outlining its factual findings with citations to the record and only facially applied the *Morrison* criteria. The trial court again found Harris' numerous absences

supported a finding of unfitness and her failure to provide lesson plans for substitute teachers was both persistent and willful.

DISCUSSION

I

When a superior court reviews the Commission's decision for either the governing board or the employee, it exercises independent judgment on the evidence. (Ed. Code, § 44945.) An appellate court must sustain the superior court's finding if supported by substantial evidence. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53].)

The independent judgment test requires the superior court to determine whether the weight of the evidence supports the Commission's findings. (Code Civ. Proc., § 1094.5, subd. (c); *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29].) However, even under the independent judgment test, the superior court may not make its judgment in complete disregard of the Commission's findings. Rather, *the superior court must give "substantial weight" to the Commission's factual findings.* (*San Dieguito, supra,* 135 Cal.App.3d 278, 288.) The California Supreme Court has long held an exercise of independent judgment on the facts "does not mean that the preliminary work performed by the administrative board in sifting the evidence and in making its findings is wasted effort. As was pointed out in the *St. Joseph Stock Yards* case, *supra* [298 U.S. 38, 52 (80 L.Ed. 1033, 1041, 56 S.Ct. 720)], in weighing the evidence the courts can and should be assisted by the findings of the board. *The findings of the board come before the court with a strong presumption of their correctness, and the burden rests on the complaining party to convince the court that the board's decision is contrary to the weight of the evidence.*" (*Drummey* v. *State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 85 [87 P.2d 848].) (See also *Chamberlain* v. *Ventura County Civil Service Com.* (1977) 69 Cal.App.3d 362, 368 [138 Cal.Rptr. 155].)

Even when the standard of review is the independent judgment test, "[a] strong presumption supports the correctness of the findings of the administrative agency." (*Campbell* v. *Board of Dental Examiners* (1971) 17 Cal.App.3d 872, 875-876 [95 Cal.Rptr. 351], citing *Dare* v. *Bd. of Medical Examiners* (1943) 21 Cal.2d 790, 798 [136 P.2d 304].) This presumption is rooted in the agency's particular expertise regarding the dispute, the agency's better opportunity to observe the witnesses, and the presumption of

correctness which attaches generally to official acts. (Evid. Code, § 664; *Board of Administration* v. *Superior Court* (1975) 50 Cal.App.3d 314, 320 [123 Cal.Rptr. 530]; see also *Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 38 [143 Cal.Rptr. 365].) Although the standard of review under the independent judgment test requires more penetrating scrutiny than does substantial evidence review, nevertheless, the superior court procedure is essentially not a new trial from square one but an appellate review procedure. The burden still rests on the challenger of the agency's decision to establish error. (*Campbell, supra,* 17 Cal.App.3d 872, 875; *Schoenen* v. *Board of Medical Exrs.* (1966) 245 Cal.App.2d 909, 913 [54 Cal.Rptr. 364].)

## II

The rule that the superior court must give substantial weight to the findings of the administrative body rests on two grounds. First, as pointed out in our earlier opinion, "[t]he Commission is a legislatively mandated professional body, with experience and expertise in the area of determining fitness to teach." (*San Dieguito, supra,* 135 Cal.App.3d 278, 288.) Such experience and expertise should not be lightly disregarded.

Second, the administrative body had the opportunity to actually observe the witnesses. In contrast, the superior court has only the transcript of the proceedings. The transcript contains only the words of the witnesses and fails to include nearly all the important nonverbal aspects of communication, e.g., the tone and pitch of the witness' voice, his or her hesitation or readiness in answering questions, carriage, gestures, yawns, the use of eyes, shrugs, self-possession or embarrassment, and air of candor or seeming levity. Some courts, in recognition of the superior court's lack of opportunity to observe the witness' demeanor, have stated the determination of the credibility of witnesses is a matter for the administrative body. (*Campbell* v. *Board of Dental Examiners, supra,* 17 Cal.App.3d 872, 876; *Arenstein* v. *California State Bd. of Pharmacy* (1968) 265 Cal.App.2d 179, 188 [71 Cal.Rptr. 357].) These statements are not quite accurate. Under the independent judgment rule, the superior court necessarily is permitted to reweigh the credibility of witnesses. However, in reweighing credibility, the court must give due consideration to the fact that the administrative hearing officer had the opportunity to observe the witnesses' demeanor while the superior court does not. (See Barkett and Snyder, *California Administrative Mandamus* (Cont.Ed.Bar 1984 Supp.) § 5.74, p. 88.)[2]

---

[2]"See Gardner & Greenberger, *Judicial Review of Administrative Action and Responsible Government* (1974) 63 Geo.L.J. 7, 36: 'The fact remains that men of ordinary ability who

Finally, when assessing the weight of the evidence presented at the administrative proceeding, the superior court must be mindful not all the evidence admitted at the administrative proceeding may be competent evidence. Government Code section 11513, subdivision (c), expressly authorizes the admission of hearsay evidence at an administrative proceeding but limits its use to "supplementing or explaining other evidence." Section 11513 specifically states hearsay evidence "shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." Hearsay evidence which would not be admissible in a civil proceeding is not competent or substantial evidence to support a finding. (See *Daniels* v. *Department of Motor Vehicles* (1983) 33 Cal.3d 532, 538 [189 Cal.Rptr. 512, 658 P.2d 1313], and fn. 3; *Walker* v. *City of San Gabriel* (1942) 20 Cal.2d 879, 881 [129 P.2d 349, 142 A.L.R. 1383].) In sorting through any hearsay evidence admitted at the administrative hearing, the superior court may not rely on the lack of an objection as permission to use the evidence as other than supplemental or explanatory. The lack of an objection does not convert legislatively declared incompetent evidence into substantial evidence to support a finding. (See *Carl S.* v. *Commission for Teacher Preparation & Licensing* (1981) 126 Cal.App.3d 365, 371-372 [178 Cal.Rptr. 753]; *Layton* v. *Merit System Commission* (1976) 60 Cal.App.3d 58, 67 [131 Cal.Rptr. 318]; cf. *Savelli* v. *Board of Medical Examiners* (1964) 229 Cal.App.2d 124, 139 [40 Cal.Rptr. 171].) As was stated by the court in *Martin* v. *State Personnel Bd.* (1972) 26 Cal.App.3d 573, 583 [103 Cal.Rptr. 306]: "If evidence (here, by statute [§ 11513]) has insufficient probative value to sustain the proposition for which it is offered, the want of an objection adds nothing to its worth and it will not support a finding. [Citation.]" Likewise an appellate court when applying the substantial evidence test to the superior court's determination must also be wary of incompetent hearsay evidence and avoid using it as "substantial evidence" sufficient to support the superior court's findings. (See *Consolidated Edison Co.* v. *National Labor Relations Bd.* (1938) 305 U.S. 197, 230 [83 L.Ed. 126, 140, 59 S.Ct. 206]; *Daniels* v. *Department of Motor Vehicles, supra,* 33 Cal.3d 532, 537-539.)

---

have spent some time, in the case of agency heads and members, or many years, in the case of the staff, dealing with specialized issues do have a special competence in their fields. In unnoticed accretions prior proceedings, luncheon conversations, the daily press, and countless other sources add to their knowledge and understanding. As a rule, we consider their judgment likely to be better than that of the most brilliant of judges, confined as the judge is to the accidents of a single record and perhaps influenced by the skill or the ineptitude of the accidentally chosen counsel. As a rule, the confusion and delays of cross-examination are more likely to be of comfort to the reviewing court than they are to be of real aid to men already familiar, personally or through their staffs, with the issues.'" (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 346, fn. 6 [156 Cal.Rptr. 1, 595 P.2d 579].)

It is significant to note that if the statute here involved did not specifically provide for independent judgment review of the decision regardless of which party appeals (Ed. Code, § 44945), District would be entitled only to substantial evidence review of the Commission's decision. This is true because, unlike Harris, District does not have a fundamental vested right at stake. (See *Interstate Brands* v. *Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774-775 [163 Cal.Rptr. 619, 608 P.2d 707]; *Pacific Legal Foundation* v. *Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 108 [172 Cal.Rptr. 194, 624 P.2d 244]; *Sierra Club* v. *California Coastal Zone Conservation Com.* (1976) 58 Cal.App.3d 149, 155-156 [129 Cal.Rptr. 743].) As stated by our Supreme Court, quoting from *Northern Inyo Hospital* v. *Fair Empl. Practice Com.* (1974) 38 Cal.App.3d 14, 23 [112 Cal.Rptr. 872]: "'Applying *Bixby* guidelines, Hospital's right to establish its employment practices and procedures and to impose conditions of employment can in no sense be termed a fundamental vested right. While the right to pursue a lawful business or occupation is a fundamental right [citing cases], there is no vested right to conduct a business free of reasonable governmental rules and regulations (see *Bixby* v. *Pierno, supra,* 4 Cal.3d 130, 145-46 . . .; *Beverly Hills Fed. S. & L Assn.* v. *Superior Court,* 259 Cal.App.2d 306, 316-317 . . .).'" (*American National Ins. Co.* v. *Fair Employment & Housing Com.* (1982) 32 Cal.3d 603, 607 [186 Cal.Rptr. 345, 651 P.2d 1151].) (See also *Kerrigan* v. *Fair Employment Practice Com.* (1979) 91 Cal.App.3d 43 [154 Cal.Rptr. 29].) The trial court, when scrutinizing the action of District here, should have been sensitive to the fact that the agency opted to preserve the fundamental right involved—Harris' right to practice her profession and earn her livelihood—and that the challenging party, District, seeks through administrative review in the courts to take that fundamental right away. Under those circumstances, despite the statutorily mandated independent judgment review for both sides, we would in fact expect far more searching, in-depth judicial review to have taken place had the agency ruled in the opposite direction. When the agency takes away so fundamental a right as the right to practice a profession (essential to the pursuit of life, liberty and happiness, see *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 17 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351]), the courts must scrutinize that administrative decision with great care in light of the potential grave loss to the appealing party. However, where, as here, the agency has opted to preserve that precious right, we think far more deference to the decision of the administrative agency is appropriate. By overturning that decision, the superior court divests a party—Harris, here—of that most important fundamental right to work for her living, a right "of the very essence of the personal freedom and opportunity that it was the purpose of [the Fourteenth] Amendment to secure." (*Sail'er Inn, supra,* quoted in *Kerrigan* v. *Fair Employment Practice Com., supra,* 91

Cal.App.3d at p. 50.)[3] Certainly in the abstract, the statute (Ed. Code, § 44945) mandates equality of review for both sides. However, realistically speaking, as the commentators agree, the application of the label "independent judgment review" does little to describe the actual process by which courts review administrative agency action. This process in fact varies with the importance of the right involved and also the nature of the problem, whether it is most suitably considered by a judicial or administrative tribunal. (See, e.g., discussion in 5 Davis, Administrative Law Treatise (2d ed. 1984) 331, 381.) In short, here, in second-guessing the expert agency and thereby divesting Harris of her right to earn a living, the superior court acted beyond its suitable appellate discretion in such a matter. The superior court reweighed evidence to an extent impermissible and unsupported by the record, as shall be discussed.

### III

As previously noted, the trial court again found Harris' numerous absences established unfitness, this time purporting to apply the *Morrison* criteria and find a factual nexus between her absences and unfitness. However, not only do the majority of the trial court's findings rest upon incompetent hearsay evidence,[4] but we also disposed of this issue in our earlier opinion

---

[3](See also *Guymon* v. *Board of Accountancy* (1976) 55 Cal.App.3d 1010 [128 Cal.Rptr. 137], a position which comports with my thesis that the "independent judgment" review by the superior court need be less searching when it opts in favor of a *fundamental right* in issue; in contrast, where a fundamental right is taken away, the judicial review should be more penetrating.)

[4]The trial court in a 10-page statement of decision made 15 factual findings which were supported by citations to the record. An examination of the citations reveals findings 6, 7, 8, 10, 12, 13, 14 and 15 were pure hearsay, i.e., testimony by witnesses as to what others (often unnamed) had told them, e.g., parents testifying as to what their children had told them, teachers testifying as to what students had told them, administrators testifying as to what parents or students had told them. Some of the factual findings additionally do not accurately reflect the witness' testimony. Findings 7 and 10 concern students seeking transfer from Harris' classes supposedly due to her absences. However, the evidence reveals the thrust of the students' complaints was directed to personality conflicts with Harris and not her absences.

In findings 9 and 10, concerning whether Harris' Spanish class students were as well prepared as other students, some of the citations are ambiguous and others nonsupportive. In finding 9, stating Harris' students were given extra review so they could catch up with the students in the class they transferred to, it is unclear whether these students needed extra review because of a difference in the text books used by Harris compared to the new teacher, or because the students were underachievers or because Harris' absences had a detrimental effect on their education. As to the Spanish class substitute who testified Harris' students were not as well prepared as other students, the substitute actually testified Harris' students were not as strong in sentence structure and pronounciation but did "very well" in conjugation.

Finally, as to the trial court's remaining findings (1-5) concluding substitute teachers cannot provide the same continuity as a regular teacher and that excessive absences have a

when we found "[t]he trial court was presented with undisputed facts the absences upon which the District formed the basis for removal were considered legitimate." (*San Dieguito, supra,* 135 Cal.App.3d at p. 286.) We therefore concluded "[t]he District by its stipulation has precluded the charge that Harris' absences are unreasonable." (*Id.*, at p. 287.)

## IV

At the administrative hearing, only 15 dates were specified when there were problems with Harris' lesson plans. Broken down by school year, these instances of lesson plan problems fall as follows: no instances out of 22 absences in 1976-1977; 6 instances out of 54 absences in 1977-1978; no instances out of 38½ absences in 1978-1979; and 9 instances out of 33½ absences in 1979-1980. Thus, over the four-year period, Harris provided lesson plans 90 percent of the time. On eight of these dates lesson plans were actually provided.

These dates are lifted from hearsay documents, i.e., memoranda from the school administration to Harris. Several of these memoranda were issued weeks or months after the alleged failure to provide lesson plans. Only one memorandum named the substitute and particular classes for which lesson plans were not found.

Direct testimony was presented by the witnesses who drew up the memoranda as to only four instances. This was the testimony by Edward Sweed, a school administrator. He read the memorandum involving the lack of lesson plans for March 27 and 28, 1978, which stated Harris had said the lesson plans were in her binder but when Sweed and another person looked, they saw she had lesson plans only through March 17. Sweed also testified he had personal knowledge of the lack of lesson plans for two periods on two days during April 17-21, 1978, and directed the substitute to call Harris at home. Presumably, Sweed also had personal knowledge of the incomplete lesson plan of January 9, 1978, since he was the substituting teacher who was unable to discern what vocabulary test was contemplated by the lesson plan. However, there was no specific testimony on this point. As to the remaining memoranda, the witnesses who issued them either conceded they had no personal knowledge as to the lack of lesson plans cited or did not testify as to personal knowledge.

---

detrimental effect on the education process, much of the supporting testimony was qualified, with the witness distinguishing between capable substitutes who followed lesson plans and those who did not. Thus, the testimony supporting these findings also implies, as was found by the Commission, that much of the responsibility for maintaining the continuity and quality of the education while a teacher is absent rests with the District and its obligation to provide competent substitutes.

Other direct testimony presented on the inability to locate Harris' lesson plans did not particularize the occasions[5] and therefore, it is impossible to tell whether there was any overlap between the dates in the memoranda and the occasions testified to.

## V

Two substitute teachers testified. These were *two* of sixteen substitute teachers used. Their testimony only covered Harris' Spanish classes during the 1978-1979 and 1979-1980 school years. No substitute teacher testified as to the lack of lesson plans for Harris' English classes. Neither of the two substitutes who testified specified dates in their testimony. Neither had a degree in Spanish. Both had been substituting for only two years.

One substitute, Kathleen Oversmith, had a degree in physical education. She testified she substituted for Harris seven days during the 1978-1979 school year and ten days during the 1979-1980 school year. She testified that of those 17 days, she was unable to find lesson plans three-fourths of the time. The District interprets this to mean she did not receive lesson plans on 12 occasions. She looked for lesson plans in Harris' desk but never found them there. When she did receive lesson plans, they would be next to the roll sheet, written down by a student and available at the front office. She once tried to contact Harris at home during 1978-1979 but did not reach her because nobody was home. She did not otherwise communicate to Harris the lack of lesson plans, rather she left Harris very complimentary comments about her class.

The other substitute who testified was John Silverman, an employee of Pacific Southwest Airlines. He had no Spanish credential. He testified he substituted for Harris a total of six days over the 1978-1979 and 1979-1980 school years. He never found a lesson plan from Harris in the folder given to him in the front office. One time he found a lesson plan in Harris' desk. The lesson plan had been done in advance and did not seem to him to coincide with where the class was. He never attempted to call her at home

---

[5]At the hearing, the District asserted substitute Kathleen Oversmith was testifying as to paragraphs 7, 8, 9, 10 and 12. Of these, only paragraph 12 specifies a date, April 9, 1980. The District stated substitute John Silverton was testifying to paragraphs 5, 6, 8, 12 and 14. Of these, paragraph 12 involves only one date, April 9, 1980, and, therefore shows overlap with Oversmith's testimony. Paragraphs 5 and 6 refer to problems with two lesson plans for two periods during April 17-20, 1978. Not only does this involve dates before Silverton started substituting for the District, but also on the face of the memoranda refers to an entirely different substitute teacher, Mr. Biggs. The remaining paragraphs do not specify dates.

to get a lesson plan. Nor did he testify that he ever communicated with her about the lack of lesson plans.

Thus, the two substitutes testified to approximately 16 instances when they failed to find Harris' lesson plans, *yet during the school years of 1978-1979 and 1979-1980, the school administration gave Harris official notice on only 9 instances when substitutes could not find her lesson plans.*[6]

## VI

Three teachers, colleagues of Harris at Torrey Pines High School, testified to occasions when they tried to help substitutes locate Harris' lesson plans. Darlene Palmer, the English department head, testified three substitute teachers asked her aid in locating lesson plans but she was unable to help them. She did not specify any dates. Kay Dillon, a Spanish co-department head testified three substitute teachers asked for her aid in locating Harris' lesson plans. Harris' worksheets were found but no specialized lesson plans. Dillon did not specify dates in her testimony nor name the substitutes she attempted to help.[7] Susan Martino, a Spanish teacher, testified she once unsuccessfully tried to help a substitute teacher find Harris' lesson plans during 1979-1980. She could not recall the exact day.

The evidence also shows, as a matter of regular practice, teachers left lesson plans in one of a number of places: the front office in the teacher's administrative file, in the gradebook, with the rollsheet, in or on the teacher's desk, in the teacher's work area, or in the teacher's mailbox. A number of teachers testified they had completed lesson plans for substitute teachers but the lesson plans were never received by the substitutes. One teacher, Lana Small, testified one time Harris had left lesson plans for several days but the first substitute took the lesson plans with her and therefore, they were unavailable for the second substitute. Small also testified that on several occasions she directed substitute teachers to the work area she shared with Harris and was able to locate Harris' lesson plans. One of these substitutes had been directed to her by Palmer, the English department head, who testified she was unable to find Harris' lesson plans on three occasions. Small explained Palmer did not know where Harris' desk was located. Small successfully located the lesson plan on that occasion. While Harris' depart-

---

[6]As noted in paragraph IV above, according to the District's evidence, at least one of these dates, April 9, 1980, involved an overlap.

[7]The District represented Dillon was testifying to paragraphs 12, 13 and 14. As noted previously, paragraph 12 refers to absence of lesson plans on April 9, 1980, a date also testified to by both of the substitutes. Paragraph 13 refers to the same date as paragraph 12. Paragraph 14 does not specify any dates when lesson plans were missing.

ment heads (Palmer in English, Dillon in Spanish) testified they had difficulty locating Harris' lesson plans for substitute teachers, Palmer only casually mentioned difficulty finding lesson plans on one occasion, Dillon never mentioned any problem to Harris and neither had developed a departmental policy regarding lesson plans for substitutes.

Harris testified she always provided lesson plans when she was absent.

## VII

In sum, the undisputed, competent evidence shows Harris' substitutes timely received her lesson plans for 100 percent of her absences in 1976-1977 and 96 percent of her absences in 1977-1978.[8] For the school years 1978-1979 and 1979-1980, the testimony did not break down the lesson plan problems by school years. Over this period, Harris' substitutes received her lesson plans 78 percent of her absences for her Spanish classes and 97 percent of her absences for her English classes.[9] However, during this period, Harris received notice of only nine occasions when substitutes could not find her lesson plans. Only these nine occasions should be used in a determination based on willful violation of school rules. These nine occasions reflect 13 percent of her absences during this period or a compliance rate of 87 percent.

This evidence hardly presents a picture of persistent and willful violation of school rules especially when viewed in light of testimony by both administrators and teachers suggesting that even when lesson plans were provided by an absent teacher they were not always received by a substitute teacher because lesson plans could be regularly found in one of a number of places. The school administration failed to establish the two substitutes who did testify actually looked in all the possible locations or that they called Harris to ascertain the location of her lesson plans. (Substitute Oversmith testified

---

[8]For 1976-1977 no memoranda or testimony was presented on any problems with lesson plans. For 1977-1978, four occasions out of fifty-four absences were cited in memoranda and arguably had direct testimony to support them. However, on two of these occasions lesson plans were timely provided, one date involving a vague lesson plan, the other involving omissions of two periods over two days, an omission corrected before classes began. If all four occasions are used, Harris' substitutes received "trouble-free" lesson plans 93 percent of her absences in 1977-1978.

[9]During this period, Harris was absent 72 days. The Spanish class substitutes testified they failed to receive Harris' lesson plans on 16 occasions. Palmer, the English department head, testified she could not help Harris' substitutes find Harris' lesson plans on three occasions, but Small located the lesson plan on one of these occasions. Small also testified that on one occasion, a substitute took Harris' lesson plans so that they were unavailable to the substitute on the following day. If this item is factored in, then Harris timely prepared lesson plans for 79 percent of her Spanish classes and 99 percent of her English classes.

she tried calling Harris once; Silverman testified he never called Harris.) The school administration, therefore, must share some of the responsibility for the failure of Harris' substitutes to receive her lesson plans.

As was noted in the first opinion in this case, teacher dismissal for failure to obey rules must be premised on "persistent," willful "violation or refusal." (*San Dieguito Union High School Dist., supra,* 135 Cal.App.3d at p. 287; Ed. Code, § 44932, subd. (g) (now subd. (a)(7); see *Board of Education v. Swan* (1953) 41 Cal.2d 546 [261 P.2d 261], overturned on other grounds in *Bekiaris v. Board of Education* (1972) 6 Cal.3d 575 [100 Cal.Rptr. 16, 493 P.2d 480]; *Board of Education v. Eisenberg* (1954) 129 Cal.App.2d 732 [277 P.2d 943].) *The case law requires a showing of intentional and continual refusal to cooperate.* (See *Governing Board of the Oakdale Union School Dist. v. Seaman* (1972) 28 Cal.App.3d 77, 81-82 [104 Cal.Rptr. 64]; *Midway School Dist. v. Griffeath* (1946) 29 Cal.2d 13, 18 [172 P.2d 857].)

The Seaman court held: "To hold that Mrs. Seaman was guilty of 'persistent' violation of the school board's regulations under the evidence presented in this case, even though the violation resulted in an absence of several school days, is to distort the meaning of the term 'persistent,' no matter what acceptable definition is used. The word 'persistent' is defined by lexicographers as 'refusing to relent; continuing, especially in the face of opposition . . . stubborn; persevering . . . constantly repeated.' (Webster's New World Dict. (College ed.); see Webster's Third New Internat. Dict.) And in the judicial decisions of this, as well as other states, the word has been interpreted to mean 'continuing or constant.' [Citations.]" (*Governing Board of the Oakdale Union School Dist. v. Seaman, supra,* 28 Cal.App.3d 77, 82.)

Contrast the case of *Board of Education v. Mathews* (1957) 149 Cal.App.2d 265 [308 P.2d 449], where "there was conclusive evidence of unethical conduct and an attitude of continuing insubordination. The defendant was not only absent for the 10 consecutive school days during the month of October, which absence was the basis of the charges upon which she was dismissed, but the court also found that she was absent without just or legal excuse until the following February. Furthermore, the teacher gave false reasons for absences which were caused mainly by personal and business pursuits." (*Seaman, supra,* 28 Cal.App.3d 77, 82.)

Here, *there is no substantial evidence of such intentional or persistent dereliction,* nor did the agency find any such evidence. There is instead evidence of a teacher beset by personal and family illness who nevertheless

managed to provide lesson plans the majority of the time. She has not been shown by any direct, competent evidence to have been an unfit teacher because of failure to provide such plans or for any other reason.

The decision of the superior court in this matter shows the trial judge was heavily influenced by the number of teacher absences. The greater part of that decision discusses the harmful effect on the district of frequent teacher absences and only a small part of the reasoning is devoted to the failure to provide lesson plans. Fifteen separate instances are cited of problems allegedly flowing from frequent absence, whereas the much shorter discussion of the question of failure to provide lesson plans simply notes some of the evidence we have discussed, mostly hearsay, indicating occasional inability of substitute teachers to find Harris' lesson plans. Also, the trial court's determination of "willfulness" is grudging at best: the trial court said the Court of Appeal had directed such a finding to be made; the decisions "do not appear to require such a finding"; but nevertheless the trial court does find there is willfulness. There is no factual basis for the court's belief willfulness existed. It is clear that in fact the trial court was itself convinced of Harris' unfitness to teach because of her absenteeism—an impermissible consideration—and simply tacked on the issue of willful refusal to provide lesson plans as a pretext to justify reversing the decision of the administrative agency. The result is the firing of a teacher—against the recommendation of the expert reviewing agency—based on evidence largely hearsay, unconvincing and inadequate. I submit that "independent judgment review" ought not to be conducted in such a spirit and that the review process here is not the thoughtful judicial scrutiny which ought to be brought to bear on the sensitive and difficult issue of removal of this teacher from her job. Independent judgment review is not a license to overturn the factually based decision of the administrative agency below and to divest an employee of a fundamental right for impermissible considerations, justified after the fact by alleged willful malfeasance based largely on hearsay evidence. Had the trial court carefully considered the nature of the fundamental right involved, the import of the agency decision supporting that right, the quality of the evidence offered to show teacher unfitness, and the full blown context in which this issue was raised, I do not think it could have reasonably found the agency conclusion of fitness to teach was unsupported. On the contrary, it was fully supported, and the reweighing of the evidence to reach a contrary result was artificial and distorted. If the function of a court of review is to have any meaning, such a result cannot stand. Not only is there no substantial evidence to support the reversal of the agency finding here, there is no evidence at all to show teacher unfitness warranting loss of employment.

## VIII

Finally, there is no evidence substantial or insubstantial to meet the requirement that an individual *"can be removed from the teaching profession only upon a showing that his [her] retention in the profession poses a significant danger of harm to either students . . . or others."* (*Morrison v. State Board of Education, supra,* 1 Cal.3d 214, 235, italics added.) And there must be "credible, competent evidence" to support any inference of petitioner's "unfitness to teach." (*Id.,* at p. 238.)

In determining whether the "unfitness to teach" criteria were met, the *Morrison* court set forth its now widely accepted seven areas of inquiry that a board may consider in determining the "unfitness to teach" issue. *Morrison* suggested seven criteria that should be considered in addition to the teacher's conduct in determining unfitness to teach: (1) likelihood of recurrence of the questioned conduct; (2) extenuating or aggravating circumstances; (3) effect of notoriety and publicity; (4) impairment of teacher-student relationship; (5) disruption of the education process; (6) motive; and (7) proximity or remoteness in time of conduct. (See *San Dieguito Union High School Dist.* v. *Commission on Professional Competence, supra,* 135 Cal.App.3d 278, 284.)

A dispassionate analysis of the evidence in this case warrants this unqualified conclusion: Not *one* of the *Morrison* criteria hint at, let alone support, the removal of this teacher. The failure to apply these standards make the superior court judge the final arbiter of teacher fitness with power of teacher removal possessed by no school board. This is not the law. The cause should be reversed.

## IX

Here, the trial court erred in reversing the agency decision. I am mindful of the limitations on our review of the trial court; its decision must be affirmed here if supported by substantial evidence. What I perceive, however, of the court's decision is that its very process of review was infected by a fundamental misconception of its role. The court did not begin as a starting point with the agency decision and proceed to consider whether the evidence in the record, in the court's judgment, supported the result. Instead, the court started with what it viewed as a correct result—namely, that Harris should be deemed unfit because of her cumulative absences—and from there the court proceeded to isolate from the record evidence, completely or incompletely supporting its conclusion. In effect it tried the case from the beginning, excepting that instead of calling live witnesses it relied

on the transcribed testimony. It is understandable that a court whose business largely consists of original matters should approach the task of independent judgment review as though it were a problem of original fact finding and decision making. Although understandable, that approach is erroneous. An appeal court as a tribunal perhaps more sensitive to the nuances of review—since that is most of what we do—should be better situated to formulate and give guidance on the proper approach to such task. Be the standard of review substantial evidence, independent judgment, or other formula, the starting point for review must be the agency decision, and the ending point ought not to be different unless there is good reason for that difference. Here, ample evidence supports the agency decision that Harris is not unfit to teach. That evidence consists of (1) the legitimate and authorized nature of her absences and (2) the complete lack of competent evidence showing willful refusal to supply lesson plans. Accordingly, the superior court should not have overturned the agency's choice. It could only do so by reweighing all the relevant factors, including in particular the significance of the cumulative absences which clearly most influenced the court, and by thereby deciding the case again, from the beginning, as if the agency had never ruled. That procedure is not a process of review and goes beyond the scope of the superior court's proper control of the administrative process. Accordingly, in the sense that the superior court engaged in a flawed decision making process, no substantial evidence supports its decision, and I would opt to reverse it.[10]

The judgment should be reversed.

A petition for a rehearing was denied December 16, 1985. Staniforth, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied March 27, 1986. Bird, C. J., was of the opinion that the petition should be granted.

---

[10]The case of *Perez* v. *Commission on Professional Competence* (1983) 149 Cal.App.3d 1167 [197 Cal.Rptr. 390], treats with the limited nature of the review of the trial court decision in a teacher fitness case. In *Perez,* the trial court had *affirmed* the decision of the Commission on Professional Competence finding the teacher was incompetent. Under those circumstances, where two fact finding agencies have agreed on the matter, the scope of our review should clearly be more limited than where, as here, the trial court has reversed the agency decision and has itself made the findings of teacher incompetence. Also, the *Perez* case is distinguishable in that there existed a wealth of evidence of the teacher's unfitness to teach, his complete lack of control of his classroom, whereas here the only competent evidence of teacher unfitness is the testimony of two substitutes (from a total of sixteen) that they could not find lesson plans. The cases simply do not compare.