Filed 11/19/21  Merced County v. Kong-Brown CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MERCED COUNTY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>BARBARA KONG-BROWN,<br><br>    Defendant;<br><br>BILLY BUSH,<br><br>    Real Party in Interest and Appellant. | F080450<br><br>(Super. Ct. No. 19CV-00783)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Merced County.  Donald J. Proietti, Judge.

Forrest W. Hansen, County Counsel, Janine L. Highiet-Ivicevic and Thomas E. Ebersole, Deputy County Counsel, for Plaintiff and Appellant.

Rains Lucia Stern St. Phalle & Silver, Timothy K. Talbot and Zachery A. Lopes, for Real Party in Interest and Appellant.

-ooOoo-

Merced County terminated the employment of Billy Bush, a jail corrections officer employed by the Merced County Sheriff's Department. Bush appealed his termination and the matter proceeded to an administrative hearing before an administrative hearing officer. The administrative hearing officer overturned the termination and ordered Bush's reinstatement. The county then sought judicial review of the administrative decision by filing a petition for writ of mandate in the superior court. The superior court denied the county's petition for writ of mandate and upheld the administrative decision. The county now appeals the denial of its petition for writ of mandate. Bush cross appeals. He raises a single, limited issue in relation to the county's appeal, but does not contest the judgment. We affirm.

## FACTS AND PROCEDURAL BACKGROUND

This case arose from the termination, on August 24, 2017, of Corrections Officer Billy Bush's employment as a jail corrections officer with the Merced County Sheriff's Department (sheriff's department). Bush had been employed as a jail corrections officer by the sheriff's department since April 2005. The process that led to Bush's termination began when the sheriff's department opened an internal affairs investigation regarding Bush's role in an incident that occurred at the Merced County Jail (the jail) on April 19, 2017. Bush was involved in the incident in his capacity as a jail corrections officer. The internal affairs investigation concluded that Bush had violated multiple policies of the sheriff's department and Merced County (the county) and merited termination. Bush was served with a written notice of the sheriff's intent to terminate his employment with the county; the intent-to-terminate notice charged Bush with violating multiple policies of the sheriff's department and the county. Bush sought a *Skelly* hearing regarding the charges against him.[1] Following the *Skelly* hearing, Bush was terminated.

---

[1] *Skelly v. State Personnel Bd*. (1975) 15 Cal.3d 194.

2.

Bush appealed his termination under the county's Human Resources Rules and Regulations, pursuant to which the matter was referred for an administrative hearing. The administrative hearing officer overturned Bush's termination and ordered his reinstatement. The county then filed a petition for a writ of mandate (commencing an administrative mandamus proceeding) in the Merced County Superior Court. The superior court upheld the decision of the administrative hearing officer and denied the county's petition. Judgment was entered against the county. The county appealed to this court (Bush also filed a limited appeal). We affirm the judgment.

**A.     The Administrative Hearing (August 9-10, 2018)**

We will describe the jail incident that led to Bush's termination, in summary form, as reflected in the evidence presented at the administrative hearing and contained in the administrative record. The incident occurred during the graveyard shift, on April 19, 2017, and involved a jail inmate, M.R. (M.R. or the inmate). Bush was one of the correctional officers working the graveyard shift that night. The internal affairs investigation into the incident faulted certain actions Bush took in interacting with M.R. and determined that Bush had violated several policies of the sheriff's department and county, including policies concerning the use of force, disobedience, and incompetence.

The graveyard shift at the jail began at 11:00 p.m. Sergeant Christina Johann was in charge of the shift. At the beginning of the shift, Johann briefed all the correctional officers working the shift. Johann informed the correctional officers that M.R. was HIV positive. The correctional officers also learned that, earlier that evening, M.R. had to be confined in a "restraint chair" on account of erratic behavior and the risk he would harm himself or pose a danger to the facility (M.R. had been kicking a glass window in his cell and had cut his foot). The officers were further told that the inmate was either mentally ill or under the influence of drugs or alcohol. Since jail inmates may not be indefinitely confined in a restraint chair, M.R. was eventually moved to a "sobering cell" or "safety cell." He was in the sobering cell when the graveyard shift got underway. The incident

3.

at issue occurred in the sobering cell. The incident was captured on video; however, the video had no sound or audio component. The video was played at the administrative hearing and is part of the administrative record.

During the graveyard shift, shortly after midnight, jail staff became aware that M.R. was engaging in significant self-harm. Specifically, M.R. started kicking a ground-level glass wall panel or "window" at the front of the sobering cell; he then dropped on all fours and began violently ramming his head into the window. M.R. proceeded to remove all his clothes, and then continued, in the nude, to forcefully smash his head into the window. He struck his head against the window approximately 42 times. He was bleeding from his head and his feet. There was blood in the area where he hit his head against the window, on the floor, and on his body. Witness testimony indicated there was "a lot of blood" and blood was "everywhere."

A number of correctional officers, namely, Bush, Stephen Harrison, Imelda Vivero, and Megan Burk, rushed into the cell when the inmate's violent, self-harming conduct was detected. The actions Bush took in controlling M.R. over the next several minutes lead to his termination. The inmate's HIV positive status, the fact he was bleeding, and the fact there was a large amount of blood splattered in the cell, were major concerns for the responding officers. The only personal protective equipment (PPE) the officers had was latex gloves. It was not a calm situation. Bush was the most senior line officer among the officers there and took the lead in controlling the situation; he acted as a "protector" to the other officers. Sergeant Johann entered the cell with the officers, only to leave to get a camera; she later returned with a camera and took pictures of the inmate.

Burk testified the corrections officers were not trained in techniques for controlling combative inmates who are HIV positive, let alone HIV positive and bleeding. Burk testified: "I remember the guy hitting his head so hard against the window that it was – it was unlike anything that I had ever seen before, I know that."

4.

Burk added: "There was blood all over the floor where he was hitting his head and on the window where he was hitting his head and [he had] busted his head open." Burk explained the video did not reveal the full extent of the blood in the cell.

As Bush and Harrison entered the sobering cell, they gave verbal commands to M.R. to stop ramming his head into the glass window. Burk also gave commands. M.R. did not comply. At that point, Bush used his expandable baton to strike M.R. two times on his thigh; M.R. stopped hitting his head into the glass and followed instructions to get into a prone position on the floor of the cell.[2] Harrison started to handcuff M.R.; M.R. would not comply and was refusing to move his right arm. Bush then twice tapped M.R.'s right arm with his expandable baton, using "medium to light" force, and ultimately reached over and grasped M.R.'s arm and moved it so Harrison could handcuff M.R. Sergeant Vince Gallagher, who subsequently conducted the internal affairs investigation into the incident, testified that the use of the baton on the inmate's arm constituted an "unjustified" use of force.

Since M.R. was bleeding from his head, the jail's medical staff was alerted, and a nurse came to the cell. The nurse was nervous about attending to the inmate given his erratic behavior and the blood in the cell. Bush turned the inmate over onto his back, so the nurse would better be able to examine his head wound. It was not possible to position a spit mask over the inmate's head because the nurse needed access to the inmate's head.

The county focused, at the administrative hearing, on three instances where Bush used his feet to control the inmate, from this point forward. Sergeant Gallagher testified that Bush's use of his boot to control the inmate—which included stepping on the inmate—in these three instances, constituted unwarranted use of force under department policy.

---

**2** This conduct did not factor into the county's decision to terminate Bush.

In the first of the three instances, Bush briefly placed his boot on the top of the inmate's head, presumably to prevent movement while the nurse attended to the inmate's wounds. Bush testified at the administrative hearing that his boot was not touching the inmate's head but, rather, he hovered it above the inmate's head, better to control the inmate should the latter make any erratic movements while the nurse attended to his head wound. More specifically, Bush testified: "I actually was not on [the inmate's] head. I was slightly above it just in case he tried to throw his head backwards or make a sudden movement with his head to try to get the blood from his hair onto [others]."

Next, as seen on the video, Bush placed his boot on the inmate's chest/upper abdomen for approximately a minute. He momentarily appeared to shift his weight to the foot that was on the inmate's chest/upper abdomen, rolling his boot; however, the video evidence is not entirely clear on this point. Bush explained his actions at the administrative hearing: "For the most part he was not – how can I say this without making it – [the inmate] wasn't moving around to an extreme amount. He was applying pressure or posturing or tensing which you might not be able to see in the video. You can feel it if you're standing on somebody if they flex their abs or tense their chest muscles to try to make a move, just like if you have somebody in an arm bar and they are going to try to pull their arm out, you're going to feel the muscles in their arm contract before they try to pull or while they try to pull, and you can react to that." Bush added: "So that was mainly why I … continued to put my foot on him. If he was completely laying there perfectly still, wasn't doing anything, then I would have no reason to put my foot on him other than to make sure he didn't make any sudden movements, especially while the nurse was down there by his head that he may transfer his fluids onto her, because she didn't have any protective equipment on either outside of gloves."

Finally, at a later point, the inmate, who was handcuffed, appeared to try to elevate his upper body from a prone position; Bush then briefly placed his boot on the inmate's

6.

right forearm.**3** Bush said he was concerned about the inmate's attempt to get up "only because of his erratic behavior." Since all the officers were in the cell, and none were in the doorway of the cell or outside it, and because the inmate "was not leg shackled yet," there was a concern that he could have jumped up and run out of the cell, which would then have required a more intense response.

Bush's explanation that the inmate was not entirely compliant, and that the video did not fully capture the reality confronting the officers, was borne out by other evidence. Burk testified that the inmate was resisting. She explained: "When we were trying to hold him down, he kept moving. He wouldn't hold still, especially when medical came in to check him." She added the inmate "was just squirrelly [and] wouldn't stay still." Burk noted that the inmate would tense up and this conduct was not discernible on the video.

Bush testified that he used verbal commands to attempt to control the inmate throughout. For example, Bush ordered the inmate to stop banging his head before the officers entered the cell, to get down on the ground when the officers entered the cell, and to stay still when the nurse was attending to his head wounds. This was the first time Bush had been required to restrain an inmate who was HIV positive, acting erratic, and bleeding. Bush, who took the lead role in controlling the inmate, explained that since the inmate was HIV positive and bleeding, the situation was unique in the jail setting; normally, more officers would move in and physically restrain the inmate. He further noted: "If I was in a protective suit, I would have gone hands on just like any other time I've ever done any use of force." Under the circumstances, Bush relied more on his baton and boot. In placing his boot on the inmate's chest/abdomen, Bush "appl[ied] the force necessary to make him not move"; Bush kept his foot there briefly as he felt the

---

**3**      Another officer, Burk, also used her feet to control the inmate's legs, at one point, "[b]ecause he kept moving."

inmate move multiple times and to try to get up, while the nurse was attending to his head.

Lieutenant David Alvey, who reviewed the internal affairs investigation and signed the letter of intent to terminate, was asked at the administrative hearing: "But we don't know if [the inmate] was tensing up or trying to raise up. We just don't know that, do we?" Alvey responded: "I would have to agree with that. [¶] There's no audio. It would help if there was audio, but there's not." Alvey was then asked: "[T]here's no audio so we don't know what's being said. We don't know what sounds [the inmate is] making. We don't know what commands are being given at the time, correct?" Alvey answered: "Correct." Next, Alvey was asked: "And just five minutes before that [the inmate] was banging his head against the wall[?]" Alvey replied: "Yeah." Alvey was then asked: "So we have no idea what this inmate would have done given his mental state at the time, do we?" Alvey responded: "No."

Bush explained that he was concerned about the blood because the only PPE the officers had was latex gloves; they did not even have masks. Bush stated: "There was blood on the lower window of the cell … where he was banging his head … and then blood on the floor by the window, and then of course blood on the ground where he was proned out." Bush noted that "for the most part [he was] always the one that would go in first, especially to protect [his] … coworkers." Bush was concerned about contamination from the blood and about the safety of his fellow correctional officers. Bush testified that, following the incident, the sheriff's department got better PPE, including cover outfits, face shields, etc.

Burk also explained Bush's use of his boot on the inmate in similar terms. Burk testified: "[T]he reason why the situation was handled in [that] way was because the inmate was HIV positive and we did not have – that's why a boot was used versus hands. Because Bush has never used his boot before on an inmate. We always go hands on. But since there was blood and we knew that the inmate was HIV positive, that's why it was

handled that way." Burk added: "Our gloves are awful. They rip super easily." Burk indicated that it was safer to "trust your boots" than to "trust your gloves that are going to rip with an HIV-positive inmate." Burk noted the inmate's HIV status was "[a]bsolutely" a cause for concern; Burk did not want HIV and did not want to take it home to her family. Burk testified: "Bush handled that whole situation pretty much by himself so everybody else wouldn't have to come into contact with the HIV blood."

Nurse Her also explained, in an interview conducted in connection with the internal affairs investigation, that the inmate's HIV status and the presence of blood in the cell was a big concern for the officers. In the interview, Nurse Her said that the corrections officers were trying to stay away from and not touch the inmate "because they did not want any of his blood on them." She said the corrections officers "were really terrified." Nurse Her did not recall the inmate being in pain when Bush placed his foot across his chest; she would have remembered if the inmate had yelled for Bush to stop.

At the administrative hearing, Sergeant Johann, the sergeant in charge of the shift at the time of the incident, acknowledged that a person with HIV is a risk to correctional officers, as "[blood and] sputum are contaminants." The sergeant recognized that the inmate could have "flung" blood at the correctional officers as he was bleeding at the time. The sergeant further acknowledged that, in terms of PPE, the officers only had latex gloves, which are susceptible to tearing, and that the officers did not have anything protecting their faces or eyes.

Bush did not have a prior disciplinary record. However, on one occasion, on July 7, 2016, the sheriff's office took "corrective action" by providing Bush with a "counseling memo" and having him undergo, on September 7, 2016, a general, four-hour, use of force training in a one-on-one format with a sergeant. The latter training did not address techniques for securing HIV-positive inmates or HIV-positive inmates who are bleeding. Bush had never received training regarding how to handle an inmate who was bleeding, HIV positive, and acting in a violent manner. At the administrative hearing,

9.

Sergeant Johann acknowledged that use of force situations tend to be fluid and unique. Bush was asked, at the hearing: "Based on what you know now, would you have done something differently?" Bush responded: "[I]f there were PPEs, yes, I would have done it differently, but the same circumstances with the same staff under the same sergeant, no, I would have done everything exactly the same."

Sergeant Johann testified at the administrative hearing that she told Bush to "stop" and "knock it off," when he had his foot on the inmate's torso during the incident in the cell; she further stated that Bush complied with her request. However, Bush testified that Johann did not issue any commands in connection with the incident and he was certainly not intentionally disobedient. Furthermore, Johann approved the use of force report Bush submitted after the incident and did not separately document any command given to Bush or any disobedience on his part. Burk and Vivero both testified Johann did not issue any commands during the incident; registered nurse Shoua Her, when interviewed for the internal affairs investigation, also did not recollect such a command; Harrison believed Johann told Bush generally to "chill" but did not order Bush to step off the inmate.[4] Johann also testified that she had told Bush to "stop"; however, Burk, Vivero, and Harrison either had no recollection of this or had a contrary recollection.

Evidence presented at the administrative hearing also showed that none of the other correctional officers in the cell, nor the sergeant in charge of the shift, complained about Bush's conduct at the time of the incident. Bush prepared a use of force report after the incident delineating that he put his foot on the inmate's chest. Sergeant Johann did not recall any hesitation in approving Bush's use of force report. Bush testified that Johann did not question his use of force report. Johann, as the supervising sergeant, was required under department policy to write her own use of force report regarding the incident. Although she testified that she "believe[d]" she had done so, Sergeant

---

**4**    Harrison had been with the sheriff's department for three months, at the time of the incident.

10.

Gallagher, who conducted the internal affairs investigation into the incident, testified he did not locate any use of force report prepared by Johann. At the administrative hearing Johann testified that Bush's placement of his foot on the inmate's chest was inappropriate.

Evidence at the administrative hearing showed the inmate did not complain of pain during the incident and did not sustain any injuries on account of the actions taken by Bush. M.R.'s head wounds, which were self-inflicted, required further treatment beyond that provided by the jail nurse, i.e., stitches. Accordingly, a decision was made to transport M.R. to the hospital for further treatment. M.R. never made any kind of complaint in connection with the incident in the sobering cell. Indeed, in conducting its internal affairs investigation, the sheriff's department did not interview, or even attempt to interview, M.R; nor did the department obtain M.R.'s hospital records.

At the administrative hearing, and in its post-hearing brief submitted to the administrative hearing officer, the county took the position that Bush's actions—that is, the use of his baton in the handcuffing process, the use of his boot to control the inmate, and stepping on the inmate—represented unwarranted or excessive force as the inmate did not resist the officers in a significant fashion in the minutes after he ceased banging his head into the window. As for Bush's post-hearing brief, Bush argued the county had "failed to meet its burden of proof" to establish that Bush was terminated for "just cause," as required under the county's rules, and requested the hearing officer to overturn his termination.

## B.     The Administrative Hearing Officer's Decision

The administrative hearing officer, Barbara Kong-Brown, issued a written decision and findings on November 21, 2018. The hearing officer described the issue before her as follows: "The issue presented in this case is whether the Merced County [Sheriff's] Department had just cause to terminate Billy Bush; if not, what is the appropriate remedy?" The hearing officer determined: "Based on the [r]ecord as a whole

11.

the Sheriff's Department has not met its burden of proof regarding just cause for [Bush's] termination and was not justified in terminating [Bush's] employment. There is insufficient evidence to support a basis for discipline." The hearing officer concluded: "Billy Bush shall be reinstated to his position as a correctional officer with the Merced County [Sheriff's] Department."

### *(1) Hearing Officer's Findings*

In reaching her decision, the hearing officer found, inter alia, that Bush (i) was inadequately trained, (ii) had inadequate PPE, and (iii) was inadequately supervised during the incident.

As to training, the hearing officer found that Bush had not received "any training on how to deal with a combative HIV positive inmate who had blood spewing all over the cell floor." She noted: "[Bush] received a training in July 2016 which consisted of a power point presentation. The presentation did not include defense tactics [or] hands-on training on how to deal with someone like inmate [M.R.]"

As to PPE, the hearing officer found: "None of the officers, including [Bush], were provided with any meaningful personal protective equipment from the County. All they had were latex gloves which were woefully inadequate in dealing with the combative inmate who was HIV positive, had banged his head against the cell window 42 times, resulting in blood being strewn all over the cell floor. [Bush] was justified in being concerned for fear of contamination from the inmate who had just moments before, been acting in a very violent manner."

As to supervision, the hearing officer found: "There was inadequate supervision regarding the subject incident. Sergeant Johann knew in advance that the inmate was HIV positive, had been violent and placed in a restraint chair prior to being placed in the holding cell. She also knew that he had been bleeding because he had repeatedly kicked his cell window. Although she entered the cell she left after a few seconds without providing any supervision or guidance to [Bush] or the other officers. She simply left to

12.

get a camera so she could take photographs of the inmate. Knowing the inmate's HIV positive status and his violent behavior just prior to the officers entering the cell she should have provided better supervision rather than just leaving the officers in the cell to get a camera to take pictures."

The hearing officer further noted, with regard to supervision: "Furthermore, at the time of the subject incident Sergeant Johann did not question [Bush's] use-of-force report which included the use of his foot on the inmate's chest. This belies her testimony that she thought that [Bush] used inappropriate force. If she thought that his use of force was inappropriate she should have questioned his use-of-force report. The fact that she did not supports a finding that she did not find his use of force on the inmate inappropriate"

Finally, the hearing officer observed: "The situation cannot be viewed in a vacuum. In reviewing the totality of the circumstances, [Bush] and the other officers were faced with an inmate who had to be placed in a restraint chair a few hours before because he was kicking the windows, and then repeatedly banged his head 42 times in the cell window, causing blood to be strewn all over the cell floor, which posed a contaminant threat."

### (2) Hearing Officer's "Just Cause" Analysis and Determination

The hearing officer analyzed whether the sheriff's department had established just cause for termination by a preponderance of the evidence. The hearing officer set forth the appropriate framework: "A review of discipline for alleged employee misconduct usually requires an analysis of several factors, which includes reliance on a reasonable rule or policy, prior notice to the employee of the relevant rule or policy, whether or not the disciplinary investigation was fairly and fully conducted without a predetermined conclusion, whether or not the employee engaged in the actual misconduct charged by the employer, and whether the policy is applied even handedly, whether the penalty is reasonably related to the proven offense and whether there are any countervailing or

13.

mitigating circumstances requiring modification or complete reversal of the discipline imposed."

The hearing officer addressed all the relevant factors. In applying the multi-factorial "just cause" analysis, the hearing officer evaluated whether Bush had violated any applicable departmental or county policies. Bush was charged with violating 19 policies, including five polices in the Merced County Human Resources Rules and Regulations, 10 policies in the Merced County Sheriff's Office Policy Manual, and four polices in the Merced County Sheriff's Office Corrections Policy Manual. The policies at issue basically fell into three categories: improper or excessive use of force, disobedience, and poor performance. The hearing officer found that Bush did not violate any applicable departmental or county policy.

On the question whether Bush used inappropriate or excessive force on inmate M.R., the hearing officer noted: "In hindsight, it may not have been the best practice for [Bush] to place his foot on the inmate's chest but in light of the exigent circumstances, he handled the situation in accordance with his training and experience. He had never been confronted with a non-compliant HIV positive inmate who was bleeding profusely[,] before. He had never put his foot on an inmate before and there was heightened sensitivity to the possibility of contamination from the inmate due to his HIV positive status and that he was bleeding profusely and blood was everywhere on the cell floor. There is no evidence of any injuries to the inmate's chest." The hearing officer specifically found that Bush did not violate any applicable departmental policies regarding the use of force.

The hearing officer similarly found that Bush had not violated applicable policies regarding disobedience. The hearing officer observed: "[T]here is conflicting evidence about whether Sergeant Johann told [Bush] to remove his foot from the inmate's chest. Officer Harrison's testimony was not reliable. In his interview he told Sergeant Gallagher that he heard someone tell [Bush] to move his foot. But during the hearing he

14.

testified that he did not hear anyone tell [Bush] to move his foot. Officer Burk, [Bush] and Officer Viveros did not hear Sergeant Johann tell Mr. Bush to move his foot." The hearing officer concluded that even "if Sergeant Johann told Mr. Bush to remove his foot," she also "testified that he complied with her request," ruling out any disobedience on his part.

The hearing officer further found that Bush had not violated any policies regarding incompetence. In this context, she noted that Bush was "inadequately trained and supervised and not provided with proper personal protective equipment."

Regarding the presence of mitigating factors and the reasonableness of the penalty, the hearing officer observed: "[Bush] did not have any prior discipline regarding use of force. The July 2016 incident was a counseling memo, not a disciplinary action. His work history and performance evaluations were good to excellent … and several witnesses testified to his excellent work ethic and good character and that he took on the mantle of "protector" of his fellow workers, to ensure their safety in the work place. The discipline of termination for his actions is excessive, in light of his twelve years of experience with no prior discipline."

The hearing officer determined: "Having heard all of the evidence presented and having observed the demeanor and manner of the witnesses while testifying, I find that [Bush's] termination was not for just cause."

### (3) Hearing Officer's Conclusion and Order

The hearing officer concluded: "Appellant Billy Bush shall be reinstated to his position as a correctional officer with the Merced County [Sheriff's] Department with back pay, seniority and other benefits, less unemployment benefits and other earnings."

## C. Proceedings in the Superior Court

### (1) County's Petition for Writ of Mandate

Following issuance of the administrative hearing officer's decision, the county filed, in the superior court, a petition for writ of mandate pursuant to Code of Civil

Procedure section 1094.5. The county's petition requested a writ of mandate "setting aside[,] nullifying[,] and rendering invalid" the hearing officer's decision and compelling the hearing officer to resolve the matter in favor of the sheriff's department. The petition alleged that the hearing officer's decision was "invalid" because the hearing officer "committed a prejudicial abuse of discretion in that the admissible evidence did not support, and was contrary to[,] the decision and findings." The petition further alleged the hearing officer's decision was "invalid" because "no reasonable person, based upon the entire record," "could reach the decision reached by the Hearing Officer," that (1) "Bush's inappropriate and excessive force on an inmate was appropriate"; and (2) "Bush's insubordinate activities warrant no discipline." However, there was no discussion or analysis in the county's writ petition and supporting papers, of the hearing officer's multi-factorial "just cause" analysis and determination. Bush filed an answer to the county's petition asserting that Bush was entitled to a determination in his favor.

Oral argument was held before the superior court on September 9, 2019. At oral argument, the county argued: "[T]ypically, on an administrative writ, substantial evidence is the standard of review. But when an employee has a vested right – a vested interest into the right of future employment, the crux of the review is de novo." The court observed: "So, yeah, the employee has a vested right. But in this case the petition is not by the employee. It's by the employer." The court asked the county's counsel: "What is the vested right [for purposes] of the standard of review for the employer?" The county's counsel responded: "The employee has the vested right to future employment. So the standard of review for either side [as to] the administrative writ is de novo. It doesn't matter which party is appealing that. It depends on what the right is at issue." The court again asked: "What is the employer's vested interest?" The county's counsel replied: "So the standard of review has to do [with] what right is at issue in the underlying hearing. Our right isn't at issue. It's the employee's right. So whichever party appeals still has the same standard of review." Bush's counsel contended:

16.

"[T]hat's not an accurate recitation of the law." Bush's counsel added: "[The] fundamental right of the employee doesn't crossover. There's no reciprocity with the employer."

### *(2) Superior Court's Decision Denying County's Petition for Writ of Mandate*

The superior court issued its decision on September 24, 2019, denying the county's petition. The superior court summarized the matter before it as follows: "This is an administrative writ proceeding that was heard by the Court on September 9, 2019. At issue is Petitioner's decision to terminate real party in interest, Billy Bush, from his position as a Correctional Officer following an incident of applied force to quell a combative jail inmate. Although several officers participated in the incident, real party in interest is the only one to suffer an adverse employment action. That decision was overturned by an administrative law judge (hereinafter 'ALJ'). Petitioner contends that the ALJ abused her discretion (see Code of Civil Procedure section 1094.5(b)), and now seeks judicial intervention." (Footnote omitted.)

The superior court then addressed the standards for mandamus review. The court stated: "Before reaching the merits, it is important to put into context the proper scope of review. Under [Code of Civil Procedure] section 1094.5, there are two alternative standards: independent judgment when the underlying decision involves a fundamental vested right; and substantial evidence for all others. When a public employee challenges a final determination upholding termination, that challenge always implicates a fundamental vested right subject to the independent judgment standard. [Citations.] However, the petition at bar is not analogous. It may seem like it is, but in fact this case presents the inverse of ordinary, and the equivalent of an administrative unicorn, to wit: an *employer's* 'right' to fire a public employee. Does the County, as employer, also have a fundamental right to terminate employees for cause?"

The court ultimately adopted the county's position on the question of the appropriate standard of review. The court emphasized that while it harbored "serious

reservations" on the issue, it had concluded "that a county employer has a fundamental vested right in its power to terminate an employee, and that in seeking judicial intervention by way of a writ of mandamus, a county employer is entitled to have the [administrative] decision reviewed under the independent judgment standard."

The court's decision next addressed the mechanics of the independent judgment standard. The court stated: "Applying the independent judgment standard is not, however, as empowering as one might think. While a trial court is technically allowed to 'reweigh' the evidence considered by [the administrative hearing officer] in deciding the matter, a trial court cannot overturn that decision without first finding that the [hearing officer] abused her discretion. Abuse of discretion is defined as rendering a decision that 'is not supported by the findings, or the findings are not supported by the evidence.' § 1094.5(b)." The court noted: "Here, Petitioner contends that the [hearing officer's] findings clearing Bush are not supported by the evidence presented."[5]

### (i)     Use of Force

The superior court then reviewed the hearing officer's determination that Bush's use of force was not improper or excessive. The court determined that the relevant policy in this regard was Policy 07.01, as set forth in the Merced County Sheriff's Office Corrections Division Policy Manual. The court described the policy in detail. The policy provides that corrections officers "maintain a constant state of readiness and ability to act in instances where, in their perception, the use of force or deadly force is appropriate." (Italics omitted.) The policy specifies that corrections officers "use only the amount of force necessary to bring inmates into compliance, protect life, and protect the integrity of the facility." The policy further specifies that "[t]he amount of force used by Corrections Officers must be reasonable when confronting resistance in the performance of their duties." The policy defines various levels of resistance, including compliant behavior,

---

[5]     The county's petition alleged that the hearing officer's findings were not supported by the evidence presented.

passive resistant, active resistant, assaultive: threat of bodily harm, and assailant: threat of serious bodily harm or death.

The policy provides that when an inmate is "passive resistant," the "most appropriate level of response is 'hands on' controls, including strong or forceful control holds, physical movement of the inmate, forced removal from his cell or area, etc." (Italics omitted.) When an inmate is "active resistant," the most "appropriate response is compliance techniques," which "may include all reasonable means to bring the inmate into compliance as soon as reasonably possible," such as "use of chemical weapons, use of an electrical control device …, hard physical techniques, or using other forms of physical force." (Italics omitted.) When an inmate is "assaultive," that is, perceived as a threat of bodily harm, the "appropriate level of response is immediate defensive tactics," which may include "impact weapons, use of personal weapons, or any other reasonable means available and at hand to stop the aggression, defend against attack, and bring the inmate into compliance." (Italics omitted.) The policy provides that "[o]nce inmates are perceived as active resistant, assaultive or an assailant, officers should maintain control until the subject is fully secured in an isolated cell." (Italics omitted.) The policy further provides that "[i]t is understood that reasonable officers, while employing defensive tactics, may cause injury, serious injury, and in some isolated instances, death without intending such consequences."

The superior court noted: "The parties disagree regarding the degree of resistance presented by [the inmate], and thus the amount of force Bush was supposed to constrain himself to." The court continued: "Although the [hearing officer] does not specify the level of resistance at issue here, the evidence permits the finding that Bush was—at all pertinent times—dealing with some degree of resistance." The court found that M.R.'s conduct fell "somewhere between active resistance and assaultive behavior" and noted that the county had conceded, in its memorandum of points and authorities in support of its petition, that "[M.R.] was at least actively resistant." The court concluded that, at a

19.

minimum, Bush was "authorized to use 'hard physical techniques' " and other reasonable force, under the corrections division's excessive force policy.

The court also concluded that Bush's use of force was reasonable given the exceptional circumstances at issue. In this context, the court stated:

> "Petitioner is at fault for failing to provide jail officers with personal protective attire beyond latex gloves and a spit shield [for the inmate]. In an apparent effort to deflect responsibility for failing to properly equip its employees, Petitioner pretends that coming in contact with an unstable individual trying to spill pathogenic blood is just another day at the office. Not so. Only [M.R.] knows why he smashed his own head into the cell 40+ times, but a reasonable individual could conclude that he did this to challenge authority and (hopefully) infect others. [M.R.] must have known that smashing his head into the wall 40+ times would cause bleeding, and that failing to honor verbal commands would necessitate officers coming into the cell. This would be an excellent way of 'hurting' officers without actually touching them. With a bloody head, all [M.R.] had to do was snap his head around and [let] pathogens fly. Nobody wants to wrestle with an HIV-positive individual who is bleeding profusely and acting erratic—not because someone infected is a 'lesser' human but because that individual is capable of delivering great harm to others without even trying.

> "Petitioner continues to insist that Bush used excessive force despite written polices permitting his response… Petitioner asked this Court to review the video. [Real party in interest] did not object. That review only confirm[ed] to this Court that the ALJ got it right, plain and simple. [M.R.'s] antics, repetitive need for serious restraint, and HIV-positive status combined to make this particular incident complex and unprecedented. Bush's response was not so out of step as to warrant the professional death knell of termination."

### (ii)    Other Claims

The superior court next addressed other aspects of the hearing officer's decision as raised in the county's petition. The court stated:

> "[T]he charges against Bush fell into three categories: excessive force (discussed *supra*), disobedience, and poor performance. Outside the concern regarding Bush's application of force against [M.R.], the disobedience and poor performance claims were all anchored by a single accusation that Bush ignored a direct order from a superior officer to 'stand down' or 'stop' (or words to that effect) using his boot on [M.R.]

20.

(hereinafter collectively referred to as 'the order').  The evidence supporting the contention is far from clear.  Sergeant Johann reportedly gave Bush the order only one time.  Nobody else in the cell that evening heard the order, though Harrison may have heard the Sergeant say 'chill' or something like that.  Sergeant Johann reviewed Bush's Use of Force report and did not insert any corrections regarding the order or Bush's alleged failure to comply therewith.  Sergeant Johann did not complete her own Use of Force report, which is required.  Had she done so, that would have been the time/place to clearly indicate that she gave the order, and whether Bush complied.  The video is of little assistance since there is no audio, but even a liberal interpretation of what was happening confirms some degree of chaos in the cell – which might explain why the ALJ questioned whether the order was in fact ever given.  In the end the burden of proof was on Petitioner to show that (1) the order was given, (2) Bush heard it, (3) it was safe to comply with the order, and (4) Bush did not comply with the order.  The ALJ concluded that Petitioner fell short of meeting that burden, and this is not patently unreasonable given the record.

"First, it is not clear that an 'order' was in fact given, much less ignored.  Neither side has carefully analyzed this, but a request to 'stop' or 'chill out' is not on its face an order to stop applying any force — at least not for purposes of discipline.  Department policy permitted Bush to apply the degree of force he was using to restrain [M.R.], particularly in light of safety concerns to himself and others in the cell.  Assuming Sergeant Johann actually gave an order to stop applying force, one would expect some dialogue to occur between Bush and Sergeant Johann regarding that order.  After all, 'members who are presented with a lawful order that is in conflict with department policy or other directive shall respectfully inform the issuing supervisor of the conflict.  The issuing supervisor is responsible for … resolving the conflict.'  See MCSO Policy 340.3.

"Second, even if it was an order that had to be followed, where was the *mens rea*?  Disobedience connotes a specific violation of a command or prohibition.  Insubordination implies a general course of mutinous, disrespectful or contumacious conduct.  Both require proof of intent or willfulness.  [Citations.]  There was no evidence before the ALJ that Bush heard what he considered to be a direct order, and then intentionally or willfully ignored that order.  Bush denied hearing anything, but even so, the fact that he stopped putting so much pressure on [M.R.] demonstrates compliance, not disobedience.  Even Sergeant Johann conceded that Bush complied."

## DISCUSSION

### I. Standard of Review Employed by Superior Court in Denying Writ

Preliminarily, the county and Bush disagree as to the standard of review the trial court was required to apply in reviewing the administrative decision. In the superior court, the county argued that, in ruling on the writ pursuant to Code of Civil Procedure section 1094.5, the court was required to apply the independent judgment standard. Bush argued the superior court was required to apply the substantial evidence standard. Both parties reprise these respective positions on appeal.[6] We address this issue upfront because it bears on other issues that are implicated in this appeal.

#### A. *The Independent Judgment and Substantial Evidence Standards of Review*

" 'Code of Civil Procedure section 1094.5 is the administrative mandamus provision providing the procedure for judicial review of adjudicatory decisions rendered' " in an administrative proceeding. (*Paxton v. Board of Administration of the Public Employees' Retirement System* (2019) 35 Cal.App.5th 553, 559; *Poncio v. Department of Resources Recycling & Recovery* (2019) 34 Cal.App.5th 663, 668-669 (*Poncio*) [" 'Section 1094.5 of the Code of Civil Procedure provides the basic framework by which an aggrieved party to an administrative proceeding may seek judicial review of any final order or decision rendered by a state or local agency.' "].)

When the trial court reviews an administrative decision pursuant to a petition for a writ of mandate under Code of Civil Procedure section 1094.5 (section 1094.5), it reviews the decision for abuse of discretion. (§ 1094.5.) "Abuse of discretion is established if … the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).) A trial court uses two alternative standards of review in reviewing an administrative decision in an administrative mandamus proceeding. The two alternative standards of review are the "independent

---

[6] Bush's cross-appeal addresses this single issue.

22.

judgment" standard of review and the "substantial evidence" standard of review. (*Benetatos v. City of Los Angeles* (2015) 235 Cal.App.4th 1270, 1280 (*Benetatos*).)

We first address the "independent judgement" standard of review. " 'If the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence … [and] must examine the administrative record for errors of law and exercise its independent judgment upon the evidence.' " (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1280; *Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn*. (2013) 214 Cal.App.4th 426, 433 (*Alberda*) [the trial court exercises its independent judgment upon the evidence when it reviews an administrative decision that substantially impacts a fundamental vested right].) "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c).)

In carrying out its independent review, "the trial court must afford the [administrative] decision a strong presumption of correctness and must impose upon the petitioner the burden of showing that the [administrative] findings are contrary to the weight of the evidence, i.e., the decision was not supported by the preponderance of the evidence." (*Alberda*, *supra*, 214 Cal.App.4th at p. 433.) " 'Because the trial court ultimately must exercise its own independent judgment, that court is free to substitute its own findings after first giving due respect to the [administrative] findings.' [Citations.] Thus, while the trial court begins its review with a presumption of the correctness of the administrative findings, the presumption is rebuttable and may be overcome by the evidence. [Citation.] 'When applying the independent judgment test, the trial court may reweigh the evidence and substitute its own findings for those of the [administrative adjudicator], after first giving due respect to the [adjudicator's] findings.' [Citation.] This includes examining the credibility of witnesses." (*Alberda*, *supra*, 214 Cal.App.4th

23.

at p. 433; see *Levingston v. Retirement Board* (1995) 38 Cal.App.4th 996, 1000 [trial court independently reviews the administrative record and may reweigh the evidence].) As mentioned, "abuse of discretion is established if the court determines that the [administrative] findings are not supported by the weight of the evidence." (§ 1094.5, subd. (c); *Alberda*, *supra*, 214 Cal.App.4th at p. 433.)

As for the substantial evidence standard of review, it applies " '[w]here no fundamental vested right is involved.' " (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1280.) Under the substantial evidence standard of review, " 'the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record.' " (*Ibid.*; see § 1094.5, subd. (c).) "The reviewing trial court considers all relevant evidence, including that which detracts from the decision. A court may reverse an [administrative] decision only if, based on the evidence before the [adjudicator], a reasonable person could not reach the [adjudicator's] conclusion. [Citation.] In making this determination the court presumes substantial evidence supports the [administrative] decision [citation] and resolves reasonable doubts in favor of the findings and decision." (*Hagopian v. State of California* (2014) 223 Cal.App.4th 349, 360; see *Poncio*, *supra*, 34 Cal.App.5th 663, 668-669; *JMS Air Conditioning & Appliance Service, Inc. v. Santa Monica Community College Dist.* (2018) 30 Cal.App.5th 945, 967-968.)

### B. What was the Correct Standard of Review in the Superior Court?

Bush's interest in his public employment status implicated a fundamental vested right. (See, e.g., *Melkonians v. Los Angeles County Civil Service Com.* (2009) 174 Cal.App.4th 1159, 1167 (*Melkonians*) ["Discipline imposed on public employees affects their fundamental vested right in employment."]; *Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1042; *Barber v. Long Beach Civil Service Com.* (1996) 45 Cal.App.4th 652, 658; *Davis v. Los Angeles Unified School District Personnel Com.* (2007) 152 Cal.App.4th 1122, 1130.) Therefore, had Bush been aggrieved by the

administrative hearing officer's decision and filed a petition for a writ of mandate under section 1094.5, the trial court would have been required to exercise its independent judgment in reviewing the hearing officer's findings. (*Davis v. Los Angeles Unified School District Personnel Com.*, *supra*, at p. 1130.)

Here, however, the county, not Bush, filed a petition for writ of mandate in the superior court, contending the court should set aside the administrative hearing officer's decision reinstating Bush. Therefore, the question is whether the county was entitled to have the trial court exercise its independent judgment on the evidence? The county argued in the trial court that it was entitled to have the court apply the independent judgment standard of review. Bush contended the county did not have a fundamental vested right in terminating Bush's employment and urged the trial court to apply the substantial evidence standard of review. The trial court agreed with the county and applied the independent judgment standard of review.

On appeal, the county simply asserts, citing no authority whatsoever, that "[t]he trial court appropriately held the proper standard of review at that level was the independent judgment test." Bush contests the county's bare assertion, contending the county cannot secure a more favorable standard of review, that is, independent judgment review, based on *Bush's* fundamental vested right, rather than that of the county.

On questions of law arising in mandate proceedings, courts exercise independent judgment, with the superior court and appellate court performing the same functions. (*Christensen v. Lightbourne* (2017) 15 Cal.App.5th 1239, 1251.) In other words, we apply our independent review without deference to the lower court's rulings. (*Ibid*.; *Alberda*, *supra*, 214 Cal.App.4th at pp. 433-434 [in an administrative mandamus action, "when the appellate issue is a pure question of law," such as whether the trial court applied the correct standard of review, we review the issue de novo]; *Melkonians*, *supra*, 174 Cal.App.4th at p. 1168.)

25.

"[A] governmental entity's interests in managing its department are not treated as fundamental rights." (*Kolender v. San Diego County Civil Service Com.* (2007) 149 Cal.App.4th 464, 470.) " ' "It is well-established that an employ*er's* right to discipline or manage its employees … is *not* a fundamental vested right entitling the *employer* to have a trial court exercise its independent judgment on the evidence." ' " (*Ibid.*; emphasis in original.) Accordingly, where the employer seeks judicial review of an administrative reinstatement of a disciplined employee, the trial court is required to review the administrative decision under the "substantial evidence" standard. (*Ibid.*; see *County of Los Angeles v. Civil Service Com.* (1995) 39 Cal.App.4th 620, 633; *Los Angeles County Dept. of Parks & Recreation v. Civil Service Com.* (1992) 8 Cal.App.4th 273, 279; *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 781 [" '[A] party has no standing to assert that an independent judgment review rather than a substantial evidence review is required unless *it* possesses a fundamental vested right on *its own behalf* which was involved in an administrative agency's action.' "]; *County of Alameda v. Board of Retirement* (1988) 46 Cal.3d 902, 908 ["[T]here [is] no reciprocity between the right of the employee to independent judicial review, and the right of the employer … [in that] the employer [cannot] invoke the independent judgment test unless it [can] claim its own [fundamental vested] right."].)

In light of the foregoing authorities, we conclude the trial court was required to review the administrative decision under the substantial evidence standard of review, not the independent judgment standard of review. However, since the county argued for the independent judgment standard of review, and the independent judgment standard of review is more favorable to the county than the applicable substantial evidence standard, the court's error in this regard is neither prejudicial nor reversible, and remand is not necessary. (See *Shenouda v. Veterinary Medical Bd.* (2018) 27 Cal.App.5th 500, 512 ["appellant bears the burden to affirmatively demonstrate error, and must show that the error was prejudicial"].)

26.

As noted, as it did in the trial court, the county continues to assert that the trial court was required, and properly agreed, to apply the independent judgment standard of review. The county argues, however, that while the trial court properly intended to apply the independent judgment standard of review, it actually applied, inadvertently, the substantial evidence standard of review. The county asks us to remand the case for the trial court to apply correctly the independent judgment standard of review. We reject the county's argument as meritless and deny the request for remand.

Here, although it was not required to do so, the court applied, at the county's behest, the independent judgment standard of review, a standard that was more favorable to the county. In its ruling, the trial court properly described the independent judgment standard of review but, evidently inadvertently, appended some language that related to the substantial evidence standard of review. Specifically, the trial court stated: "Here, Petitioner contends that the [administrative] findings clearing Bush are not supported by the evidence presented … [I]n exercising its independent judgment, this Court must afford a strong presumption of correctness concerning the administrative findings, and place upon Petitioner the burden of convincing this Court that the administrative findings are contrary to the weight of the evidence *or so lacking in evidentiary support as to render them unreasonable*." (Italics added.) The county seizes upon the italicized phrase in the above statement, and a related reference elsewhere in the court's ruling, to argue the court in fact applied the substantial evidence standard of review.

However, it is clear from the court's ruling that the court understood its function as exercising its independent judgment upon the evidence, including reweighing the evidence as it saw fit. Earlier in its ruling, the court specifically noted that in evaluating whether the administrative hearing officer abused her discretion, the trial court was permitted to "reweigh" the evidence considered by the hearing officer in deciding the matter. Furthermore, the court noted that, for purposes of independent judgment review, the county had "the burden of convincing this Court that the administrative findings are

27.

contrary to the weight of the evidence." The court thus correctly described the independent judgment standard of review, but for the final phrase in its discussion of this standard.[7]

In examining the substance of the superior court's ruling, we are satisfied the court applied the independent judgement standard of review, as it intended and as urged by the county. The court independently considered the evidence, while giving appropriate deference to the administrative decision within the parameters of the independent judgment standard of review. Accordingly, we reject the county's contention that the trial court actually applied the substantial evidence standard of review. As noted, since the court applied, with respect to the county, a more favorable standard of review than required, we conclude remand is not necessary.

## II. The County's Has Waived Any Claim That Constitutional Civil Rights Jurisprudence Applies to This Employment Matter

The county argues that the hearing officer committed legal error by failing to consider whether Bush's use of force was unconstitutional under civil rights jurisprudence premised on the Fourteenth Amendment to the United States Constitution. The county further argues the hearing officer and the trial court committed legal error in failing to uphold Bush's termination on grounds that Bush's conduct violated civil rights standards under the Fourteenth Amendment.

This is not a civil rights case brought by an individual alleging a constitutional violation by an officer acting under color of state law. Rather, this is an employment matter based on the termination, by the county, of Bush's employment, on grounds he violated various policies of the sheriff's department and county as determined by an internal affairs investigation into the underlying incident. The investigator who

---

[7]     The disputed phrase was derived from the county's own petition for writ of mandate, which stated that the hearing officer's decision was "invalid" because, in light of the record, "no reasonable person" could have made the findings at issue.

28.

conducted the internal affairs investigation, Sergeant Gallagher, testified at length at the administrative hearing. Sergeant Gallagher never indicated he considered constitutional law in evaluating Bush's conduct; nor did he testify that Bush's conduct amounted to a violation of the federal constitution. Nor did the county present any evidence to the effect that the sheriff's office had determined that Bush violated M.R.'s constitutional rights and thereby violated specific department and county policies.

After the conclusion of the internal affairs investigation, Bush was served with an intent to terminate letter, in response to which Bush asked for a *Skelly* hearing. The intent to terminate letter charged that Bush had violated multiple policies of the sheriff's department and the county. Following the *Skelly* hearing, the sheriff's department concluded, as reflected in a determination notification served on Bush, that he had violated the policies at issue, and terminated him. Neither the intent to terminate letter, nor the determination notification, indicated that Bush's conduct had been determined to violate the federal constitution and that he was being terminated for committing constitutional violations. When Bush appealed his termination in an administrative proceeding, the county once again took the position that the termination of Bush's employment with the county should be upheld because Bush had violated specific policies of the sheriff's department and the county. The county never alleged that Bush was terminated for violating M.R.'s constitutional rights or even that constitutional violations were within the scope of specifically identified policies.[8]

_____

[8]     The hearing officer summed up *the county's position* at the administrative hearing stage as follows: "[The County argues that] [t]he Sheriff's Office conducted an internal affairs investigation into Mr. Bush's conduct and the County established just cause for termination by a preponderance of the evidence. [The County further argues] [t]he operative events establish grounds for the termination. [The County alleges Bush's] conduct constituted unsatisfactory work performance, conduct unbecoming a county employee and use of improper or excessive … force in violation of Human Resource Rules and Regulations, Section 8.C-1, 3, 14, 16, 19; Merced County Sheriff's Office Policy Manual, Sections 320.3.5 (c) (e) (f) (m) (o) (u) (y) (z) (aa), 300.3; and Merced County Sheriff's Office Corrections Policy Manual, Sections 01.06.2, .5, .6, and 07.01."

In addition, the county's post-hearing brief, submitted to the hearing officer at the conclusion of the administrative hearing, did not assert the county had determined or the evidence showed Bush had violated M.R.'s constitutional rights, provide authority establishing that Bush had violated M.R. constitutional rights, or explain how any constitutional violations committed by Bush amounted to violations of specific policies applicable to him. Nor did the brief address how any constitutional violations by Bush factored into the requisite analysis to determine whether the county had just cause to terminate Bush's employment.

The decision of the administrative hearing officer noted that, pursuant to the county's human resources rules and regulations, the question at issue in the administrative proceeding was whether the county had "just cause" to terminate Bush. (See Merced County Human Resources Rules and Regulations, § 8.) The hearing officer found, inter alia, that Bush did not violate the specified polices and, in turn, that the county did not have just cause to terminate him.

The county now faults the administrative hearing officer for failing to consider, in finding that Bush did not violate various policies and making her "just cause" determination, constitutional jurisprudence based on the Fourteenth Amendment to the United States Constitution. The hearing officer was not required to address constitutional civil rights jurisprudence in a vacuum. Indeed, since there was no evidence the county terminated Bush for committing constitutional violations, even assuming these were within the scope of some of the policies the county relied on in terminating Bush, the county failed to establish the relevance of constitutional jurisprudence for purposes of the administrative determination.

In sum, the county adduced no evidence at the administrative hearing to the effect the county's conclusion that Bush used improper, unwarranted, or excessive force was based on a determination that Bush had violated M.R.'s constitutional rights. Nor did the county present any evidence to the effect that Bush was terminated because of a

determination that he had violated M.R.'s constitutional rights and was therefore in violation of specific, applicable policies. Furthermore, the county did not *argue* at the administrative hearing stage that Bush had violated M.R.'s constitutional rights and, *as a consequence thereof*, various policies of the sheriff's office and the county, and was terminated, at bottom, on account of committing constitutional violations.

Given these circumstances, the county has waived any claims to the effect that Bush violated M.R.'s constitutional rights and that the administrative hearing officer was required to consider constitutional civil rights jurisprudence and standards in making her "just cause" determination. (*City of Pleasanton v. Board of Administration* (2012) 211 Cal.App.4th 522, 541 ["The courts have consistently held parties may not advance new theories in the courts that were not presented to the administrative agency."].) The county's argument that the administrative hearing officer and the trial court committed legal error in failing to uphold Bush's termination pursuant to constitutional civil rights jurisprudence is similarly waived.

Furthermore, even assuming error in this regard, we would not reverse the judgment as the county has not shown that the error was prejudicial with respect to the hearing officer's multi-factorial "just cause" analysis and ultimate "just cause" determination.

## III. The Trial Court's Factual Findings are Supported by Substantial Evidence

The county next asks us to review the trial court's findings to ascertain whether they are supported by substantial evidence. The county states: "Typically, regardless of the standard of review at the trial court level, the appellate court's review is limited to a substantial evidence test." The county argues: "[T]here is not *substantial* evidence to support the factual findings and judgment in the trial court." We conclude the trial court's findings and judgment are supported by substantial evidence and affirm.

"After the superior court makes an independent judgment upon the record of an administrative proceeding our scope of review is limited. 'An appellate court must

31.

sustain the superior court's findings if substantial evidence supports them. [Citations.] In reviewing the evidence, an appellate court must resolve all conflicts in favor of the party prevailing in the superior court and must give that party the benefit of every reasonable inference in support of the judgment. When more than one inference can be reasonably deduced from the facts, the appellate court cannot substitute its deductions for those of the superior court.' " (*San Dieguito Union High School Dist. v. Commission on Professional Competence* (1985) 174 Cal.App.3d 1176; *Shenouda v. Veterinary Medical Bd.*, *supra*, 27 Cal.App.5th at p. 512 ["On appeal, the appellate court reviews the trial court's ruling under the substantial evidence test, '[e]ven where … the trial court …[has] review[ed] an administrative decision under the independent judgment standard of review.' … '[O]ur function on appellate review is solely to decide whether credible, competent evidence supports that court's judgment.' [Citation.] … If the record contains facts to support that judgment, we must affirm."]; *Vinson v. Snyder* (1999) 75 Cal.App.4th 182, 186, fn. 3 [same].)

As discussed above, the superior court exercised its independent judgment on the evidence in reviewing the administrative findings, as urged by the county. However, the superior could properly have applied the substantial evidence test, since the county did not have a fundamental vested right at issue in the writ proceeding before the superior court. When the superior court reviews the administrative decision for substantial evidence, then, like the superior court, we simply review the administrative record to determine whether substantial evidence supports the administrative findings. (*Benetatos*, *supra*, 235 Cal.App.4th at p. 1281.) Nonetheless, since the superior court exercised its independent judgment here, and both the county and Bush have primarily addressed the superior court's factual findings and decision, we will review, for substantial evidence, the superior court's findings rather than the administrative findings. Indeed, since the superior court applied the independent judgment standard of review at the county's urging, under the doctrines of judicial estoppel and invited error, the county cannot now

32.

contend that we should review the administrative hearing officer's findings. (See, e.g., *Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986 [judicial estoppel]; *Reilly v. Inquest Technology, Inc*. (2013) 218 Cal.App.4th 536, 552 [invited error].)

As noted, under the operative circumstances, "on appeal from a judgment denying a petition for writ of administrative mandate, the focus is on the *trial court's* findings and whether there is substantial evidence to support those findings [citations], … and the trial court's judgment is presumed correct." (*Shenouda v. Veterinary Medical Bd*., *supra*, 238 Cal.App.5th at pp. 513-514.) "As in all appeals, the appellant has the burden to show, through analysis and citation to the record, that no substantial evidence supports the court's findings." (*Id*. at p. 514; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [the appellate court " 'starts with the presumption that the record contains evidence to sustain every finding of fact' "].)

Upon reviewing the record, we conclude the superior court's findings are amply supported by substantial evidence therein. Furthermore, since the trial court's findings were consistent with the administrative hearing officer's findings, our conclusion effectively means the latter's findings are also supported by substantial evidence. As detailed in Bush's briefs, the county mischaracterizes the record in important respects and the county's arguments are overstated. We are not persuaded by the county's arguments.

### A.  Trial Court's Finding that Bush Used Force in Compliance with Department Policy is Supported by Substantial Evidence in the Whole Record

Here, the trial court did a detailed analysis of the evidence in the record. The trial court found that Bush did not violate the department's use of force policies for three primary reasons:  (1) the inmate's behavior fell "somewhere between active resistance and assaultive behavior"; (2) department policy imposed on Bush the obligation to maintain control of the inmate until he was "fully secured"; and (3) a reasonable officer in Bush's position—confronting an exceedingly erratic inmate who was HIV positive and bleeding—was entitled to rely on instruments such as his baton and boot to ensure

33.

compliance on the part of the inmate. The court's analysis and findings are supported by substantial evidence in the record.

As the trial court noted, the department's use of force policy, in the corrections context, provides that "[o]nce inmates are perceived as *active resistant, assaultive or an assailant*, officers should maintain control until the subject is fully secured in an isolated cell." The court explained: "[M.R.] was causing himself great harm, and refusing to comply with reasonable directives to stop. This falls somewhere between active resistance and assaultive behavior (the policy does not speak to an inmate harming himself)." The court also observed: "[M.R.] must have known that smashing his head into the wall 40+ times would cause bleeding, and that failing to honor verbal commands would necessitate officers coming into the cell. This would be an excellent way of 'hurting' officers without actually touching them. With a bloody head, all [M.R.] had to do was snap his head around and [let] pathogens fly."

Here, M.R. could not be fitted with a spit mask until the nurse had attended to and wrapped his head. Moreover, there was evidence that M.R. refused to give up his hands to be handcuffed and later did not comply with commands to stay still so his head could be wrapped without blood being sprayed on the nurse and officers on the scene. It was not until the end of the incident that his hands and ankles were restrained, his head was wrapped, and he was fitted with a spit mask. Bush was therefore obligated by department policy to maintain control of the inmate until that point.

The record amply supports a finding that M.R.'s behavior fell "somewhere between active resistance and assaultive behavior," permitting Bush, per department policy, to use "all reasonable means to bring the inmate into compliance as soon as reasonably possible," including "chemical weapons," "an electrical control device," "restraints," "control holds," "forced escort," "hard physical techniques," and "other forms of physical force." In addition, while the county asserts that Bush placed his "entire" body weight on the inmate, the evidence on this point was unclear (the trial court

34.

properly observed that "[a]t times it appeared that Bush may have been leaning hard on [the inmate], but neither the video nor the witness testimony provides much clarity").[9] It also bears mention there was no evidence M.R. suffered any injury from, or complained about, Bush's conduct.[10]

We conclude the trial court could properly find that M.R.'s conduct, the "repetitive need for serious restraint," and M.R.'s "HIV-positive status," "combined to make this particular incident complex and unprecedented," whereby "Bush's response was not so out of step as to warrant the professional death knell of termination."

The county claims there was no substantial evidence for the trial court to find that Bush was inadequately trained to handle the situation he encountered in the underlying incident. While the court did not comment on Bush's prior training, it did observe: "Petitioner pretends that coming in contact with an unstable individual trying to spill pathogenic blood is just another day at the office. Not so…. [T]hat individual is capable of delivering great harm to others without even trying." The evidence showed that this was the first time Bush had to deal with a bleeding, HIV-positive inmate in a jail setting. The evidence also showed that Bush and the other officers had not been trained in dealing with a HIV-positive inmate who was bleeding and behaving erratically. M.R., who was HIV positive and bleeding, had, moments earlier, acted in a way that suggested he was unstable. Indeed, he had engaged in violent conduct and cut open his head; was not complying with verbal commands; and was resisting the officers attempts to handcuff and

---

[9]  The hearing officer had noted in her decision, in summarizing the evidence presented at the administrative hearing, that Bush had placed one boot on the inmate's abdomen and/or chest and the other on the floor, and at one point lifted the latter boot off the floor. However, the hearing officer did not make an express finding of fact to the effect that Bush placed his entire weight on the inmate at any point.

[10]  Bush testified at the administrative hearing that he weighed approximately 310 pounds, give or take, and with his uniform and gear, he would weigh "anywhere from 315-320" pounds.

35.

otherwise subdue him. We discern no error in the trial court's conclusion that this was an unprecedented situation that Bush was ill-prepared to handle.

The county further claims that, given the fact that Bush was wearing latex gloves, there was no substantial evidence for the court to find that Bush had inadequate PPE. We disagree. Sergeant Johann, the sergeant in charge of the shift at the time of the incident, acknowledged that a person with HIV is a risk to correctional officers, as "[blood and] sputum are contaminants." The sergeant recognized that the inmate could have "flung" blood at the correctional officers as he was bleeding at the time. The sergeant further acknowledged that, in terms of PPE, the officers only had latex gloves, which are susceptible to tearing, and that the officers did not have anything protecting their faces or eyes. There was evidence that the medical training provided to officers by the sheriff's department described the requisite PPE for dealing with HIV-positive individuals as including masks, eyewear, and face shields, in addition to gloves. Moreover, the evidence showed that the officers were nervous and on edge in handling M.R. because the only protective equipment they had was latex gloves (they did not have masks, face shields, protective eyewear, or protective coveralls). Bush testified that the inmate's HIV-positive status, the fact that he was bleeding, Bush's lack of training and experience in handling this type of situation, and the lack of PPE, were central to his decision to use his baton and boot to maintain control from a distance. We conclude the court could properly find that "Petitioner is at fault for failing to provide jail officers with personal protective attire beyond latex gloves and a spit shield [for the inmate]."

The county also faults the administrative hearing officer for referencing "progressive discipline" in her decision, contending that the applicable policies do not refer to this concept. First, we are reviewing the trial court's findings for substantial evidence and there is no mention of "progressive discipline" in the trial court's ruling. Second, the administrative hearing officer made only a single reference to the concept of "progressive discipline," which reference was made in the course of summing up Bush's

36.

position. The hearing officer's findings and decision did not substantively rely on this concept. Third, the county claims, in this context, that Bush had a prior disciplinary record. However, the county's own witness clarified that Bush did not have a prior record of discipline (and the county's counsel acknowledged the same in his opening statement). Finally, the county's claim that the applicable policies did not refer to the concept of progressive discipline is incorrect. The county's own witness, Undersheriff Jason Goins, testified that the department had a range of levels of discipline at its disposal, "all the way from written reprimand, suspension and termination." Indeed, section 8, "Discipline Action," of the Merced County Human Resources Rules and Regulations, specifies that a county employee may only be disciplined for "just cause" and specifies a range of levels of discipline, including written reprimand, suspension, demotion, and dismissal. In any event, both the hearing officer and the trial court found the county did not meet its burden to show that Bush had acted improperly under the circumstances and hence Bush did not merit *any* discipline.

## B. Trial Court's Finding that County Failed to Establish Bush Willfully Disobeyed a Direct Order, is Supported by Substantial Evidence in Record

The trial court affirmed the hearing officer's finding that the sheriff's department failed to meet its burden to demonstrate Bush disobeyed an order from Sergeant Johann to take his foot off M.R. The trial court found that "it is not clear that an 'order' was in fact given, much less ignored," and further found that Bush had not "intentionally or willfully ignored [any] order."

The trial court's findings are supported by substantial evidence in the record as a whole. Bush specifically denied that Sergeant Johann ordered him to remove his foot off the inmate. Burk and Vivero, and Nurse Her, did not recall Johann saying anything at all.

Bush's use of force report did not mention an order from Sergeant Johann to take his foot off the inmate. Johann reviewed Bush's use of force report; she approved it without requiring any correction or supplementation. Under sheriff's department policy,

37.

Johann was required to complete a "supervisor's use of force report," but she did not fulfil that requirement. As the trial court noted, "[h]ad she done so, that would have been the time/place to clearly indicate that she gave the order, and whether Bush complied."

Finally, even assuming Sergeant Johann gave the aforementioned order, she testified that Bush complied and took his foot off M.R.

### C. Conclusion

We detect no error in the trial court's findings and conclusions, which, in the end, were consistent with those of the hearing officer. (See *Shenouda v. Veterinary Medical Bd.*, *supra*, 27 Cal.App.5th at p. 512 ["the appellant bears the burden to affirmatively demonstrate error, and must show that the error was prejudicial"]; *In re Marriage of Behrens* (1982) 137 Cal.App.3d 562, 575 [" 'The *burden is on the appellant*, not alone to show error, but to show *injury* from the error.' "].) We therefore affirm the judgment.

## DISPOSITION

The judgment is affirmed. Bush is awarded his costs on appeal.

SMITH, J.

WE CONCUR:

HILL, P. J.

SNAUFFER, J.